## EVERELL D. STILES

*v.*

## LILLIAN B. STILES.

*Filed at Ottawa June 23, 1897—Rehearing denied October 15, 1897.*

1. DIVORCE—*cruelty not a sufficient recriminatory defense to charge of adultery.* Extreme and repeated cruelty on the part of the complainant is not a sufficient recriminatory defense to a bill for divorce charging the defendant with adultery.

2. EVIDENCE—*only a preponderance is required to establish fact of adultery.* A charge of adultery in a bill for divorce is sufficiently established where the allegations of the bill are sustained by a preponderance of the evidence.

3. SAME—*direct proof of the fact of adultery is not required.* Direct proof of the fact of adultery is not required, but the same may be proved by such facts and circumstances as, by fair inference, would raise in the mind of a reasonable and just man the presumption of cohabitation and unlawful intimacy.

4. SAME—*evidence held sufficient to establish charge of adultery.* The acts of the defendant, taken in connection with the attendant facts and circumstances, discussed at length in the opinion, are held to be sufficient to establish the charge of adultery, and to warrant the Supreme Court in reversing the decree of the lower courts and directing the entry of a decree of divorce.

*Stiles* v. *Stiles,* 62 Ill. App. 408, reversed.

WRIT OF ERROR to the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. W. G. EWING, Judge, presiding.

Plaintiff in error filed his bill against his wife, the defendant in error, in the Superior Court of Cook county, setting forth their marriage, the birth of one child, now of the age of about ten years, and alleging that the defendant had committed adultery with Herbert P. Crane and others to the complainant unknown, and praying for a divorce and the custody of the child. The defendant answered denying the allegations of the bill, and filed her cross-bill, in which she alleged that plaintiff in error had been guilty of adultery, and of extreme and repeated

cruelty to her. Issues were made upon the bill and cross-bill, and after a protracted hearing before the chancellor both the bill and cross-bill were dismissed for want of equity. The Appellate Court affirmed the decree, and the complainant has brought the cause here on writ of error.

It appears from the evidence that the parties were married June 25, 1884, and lived together until about the 15th day of July, 1892. Soon after their marriage the co-respondent, Herbert P. Crane, who had from boyhood been acquainted with the plaintiff, became acquainted also with the defendant, Mrs. Stiles. He and his wife, Jessie D. Crane, whom he married in 1882, frequently exchanged calls and visits with the parties to this suit, and the two families became very intimate. The duties of Stiles kept him from home during the day from about eight o'clock in the morning until between the hours of five and six in the evening, and often made it necessary for him to be absent from the city and his home for several days at a time. Crane and Mrs. Stiles spent much of their time together, playing tennis in the afternoons, attending the theater in the evenings, and in social games at her home, where, in the absence of her husband and without his knowledge, she frequently entertained Crane, and sometimes other of her gentlemen friends, until a late hour of the night. Early in May, 1891, Stiles went to Honduras for business purposes and did not return until September. During his absence the attentions to Mrs. Stiles of Crane, as well as of others, one or more of whom were even unknown to Stiles, were continued. After his departure Mrs. Stiles received from her husband's father in Chicago, where all of the parties resided, the following letter:

*"Lillian Brower Stiles:*                              *"May 25th.*

"DEAR LILLY—I write to you with the kindest intentions and for your own good, and hope you will give the matter your serious thought and attention. I received your letter asking for money, but can furnish none now. Ev. didn't ask me to let you have any this month. I borrowed what money I let him

have to go away, and also to pay on his lots what was due. His indebtedness nearly drove him crazy, and the bills which you have run up for things not at all necessary have been a great deal of trouble to him. The fact is, you act as though you were the wife of a millionaire instead of the wife of a poor man, and you are spending money for dress and things that are not necessary for you to have, and seem to think you must have everything you want, instead of economizing and trying to help out, and doing as a wife ought to do, and taking hold and trying to help yourself and him. The men who are visiting you and with whom you keep company are only talking about you behind your back, and have already created a considerable scandal. You cannot have men at your house, and go out with men or to meet men, without its being known. In regard to money, I shall pay you what I agreed with Ev. to do, although I shall have to borrow it; but I would advise you not to run up any more bills. You seem to think the only thing you have to do is to dress and look handsome and have a good time, say nothing about the things you do, which, were they known by the public as they are by me, would create a great deal of scandal, to say the least. I felt that I could not talk with Ev. about it, but advise you as though you were my own child. I do not see how you expect to get along. You seem to be fixing up as though you had an endless bank account to draw upon. I shall be gone until after the first of next month, and ought to have gone and had a talk with you, but have had so much business trouble during the past few days that I could not do so. I let Ev. have forty dollars, which he gave you, and you should have spent it for actual necessities, but presume you have thrown it away foolishly. This letter is written you in confidence, and hope you will so regard it.        Yours,

AARON K. STILES."

Mrs. Stiles wrote to her husband enclosing the letter, and requested him to return and protect her from the imputations made against her in his father's letter, and Stiles wrote his father as follows:

*"July 5th, 1891.*

"I have just received your letter from Bessimer, which is of no value. The opinion of English engineers, who have 'played horse' with the whole of Honduras, is also of no value. I don't see what railroad facilities are needed to get gold of the country. We had fully talked the matter, and you knew the ex-

pense of packing the machinery.   On this I have been working and have moved slow.

"I am perfectly well.   Am astonished at the manner you have taken care of my wife, and have just received the letter showing the cowardly manner that you have insulted her. Why couldn't you have seen her?   Such a letter when, of all times, she needed your protection!   I cannot understand what you could be thinking of.   You know I am thousands of miles away and am compelled to stay here.   What you have hinted at are damned lies, and I will stand by my wife's good name at all times.   Will or Kit or any one can say nothing to dishonor her in my eyes.   The house was being fixed up at the expense of our landlord.   You were going away and knew she could not go to Will for money.   I am doing my duty, and am living worse than a dog would in the States to try and make a stake. I had thought you would look after my darlings.   I cannot come home at once, until I close this deal, and feel sure it is a winner.   Am positively sure that my wife is a true woman and has a distinct idea as to right and wrong.   You have done me a wrong that can never be made right.   No one but people impure could see, or imagine they saw, wrong in anything Lill does.   She may be a little thoughtless, and 'tis not to be wondered at, with no older people to advise her.   Such letters as you write hastily before leaving town are hurtful.   I have received similar.   You are all willing to find fault with Lill, but none of you would help her to know what to do.   You have left me here with no papers that were promised, my money almost gone, and not able to move legally.                                    Ev."

After the return of Stiles from Honduras, from information given him by a serving girl in the family, he found a package of letters addressed to his wife purporting to be from different men, but in the main from one Barker, who had often visited the family.   Barker's letters were signed "Sweetheart," were couched in endearing terms, and he addressed Mrs. Stiles as "darling." Discord arose between Mr. and Mrs. Stiles, but her explanations were such that by agreement these letters were destroyed and they were reconciled and continued to live together, although she testified on the trial that because of his alleged mistreatment she had not cohabited with him as his wife since some time in the year 1890.

During their married life it had been Mrs. Stiles' habit to visit the south every spring, notably in 1889, 1890 and 1891, and having complained of her health in the spring of 1892, her husband sent her in March of that year, with their daughter, to Pass Christian, Mississippi, expressing the desire that she should remain there quietly and not go to New Orleans to the Mardi Gras, which took place at that season of the year. She had been there but a few days when Crane, without the knowledge of her husband or of his wife, followed her. She spent two days in his company and went with him to New Orleans and the Mardi Gras. Upon his return to Chicago Crane received from her the three following letters:

"*My Dear Bert*—I am still 'beautiful.' My lip is not quite as hideous as it was, but my cheek is badly swollen. I am a fright. You know that, however. I found a letter from Everell awaiting me, in which he is particular to say that he 'will be very angry, indeed, if I go in to New Orleans for the Mardi Gras.' He says in his letter: 'So Fred Root is expected south. Pray, how many more?' I am determined to keep my mouth closed tight. All I shall say is that I saw you on Mardi Gras day at the Pass. I beg of you to say nothing else, dear. I must tell you again just what a lovely *time* I had on those two 'red letter days.' You surely understood just how happy I was, did you not? I do not often use the adjective 'lovely,' but I am obliged to, just here, so forgive what you might possibly term 'gushing.' I was so fortunate (or unfortunate, whichever pleases you,) as to find four Chicago women on the train after you left me. Do you remember touching a young lady's hand who occupied a seat behind me? Well, she introduced herself to me, or rather told me that she was Will Green's cousin, and said she met me here last winter. It was a great deal like your friend at the hotel at the Pass,—she had the advantage of me. But the young lady who joined her was one of the girls' pupils from Waukegan. I knew her quite well. Then the two Miss Kerrs were on also. Poor old fellow! What a bit of 'hustling' you did to get me my seat. You shall have a crown, dear, if I've to steal it when his back is turned. I am not able to go out to-day at all, but am sitting by the stove with my face tied up very artistically in a blue silk handkerchief. I am consoled with the pleasantest kind of recollections and some jolly good

candy.  However, I am obliged to fall back on the remembrance
of the 'red letter days' oftener than the candies, on account of
my miserable tooth.  It doesn't hurt my tooth to remember
and it does to nibble candy.  I am sorry to send you such a
scrawl, dear, but when you remember how 'achy' I am you will
forgive me, I know.  I am waiting to hear all about your re-
turn trip.  I hear that Fitzsimmons won the fight.  Was it
real 'blogy' and nice?  I hope for your sake that it was as de-
lightful as a prize fight can be.

"*March 3d.*                    "Yours always,      LILLIAN."

"PASS CHRISTIAN, *March 12, 1892.*

"I am lots better, my dear.  I am almost well.  My face
isn't swelled a bit, but it pains me just a little now and then,
to remind me that it is there.  I have been very *stupid* ever
since you left.  The reaction was too great for me.  The con-
trast between *this* time and *that* is awful.  I just this minute
received a telegram from you.  I will send a reply to-night; not
now, for I am too tired to hunt up a boy and the telegraph
office is so far away, dear.  I was out when it was delivered, so
didn't have that chance to reply.  I heard to-day that mamma
and the girls are coming down here.  I am glad for many rea-
sons.  I have not been in town since you left, nor do I intend
to go at once, either.  There is simply nothing to write about.
Yesterday I took a long walk and in the evening played cards.
I, however, disgraced myself by growing sleepy,—oh! so sleepy,
—at nine o'clock.  I had to excuse myself and retire.  If I talk
just like a 'nig' when I get back you will not refuse to make
polite conversation with me, will you?  I know why you did not
tell me at once about the giddy monkey charmer.  I *know* why,
but I shall not tell; so now, *there!*  I wish I might have met a
woman with some desire for a monkey,—that is, if one was in
my possession she could have it without hesitation.  What is
more beautiful or dearer to one's heart than two little 'pup
alligators?'  Nothing nearer the feminine heart, unless it is
a 'pug doggie.'  I meet on my daily rambles now and then a
woman or a man from the Windy City.  I imagine if I cared to
make myself agreeable to them I might have a good time, but
somehow I have had my 'best time,' so I wander on without
throwing into my greeting anything save coolness, and that
never attracts, does it?  I am going to tell you something that
I hope will please you.  When I got your letter saying that it
did not please you to hear of my name being used in connection
with the Amateur Dramatic Stock Company, I sat down and

wrote to Kendall Weston refusing to appear or allow my name to again have place among them. Does that suit you? I am not going to bore you much longer, for I am intensely stupid. For two nights Polly has coughed and kept me awake, so my ideas are clouded and my pen sticks. You will write to me soon, will you not? Don't forget just what a lonely being is

LILLIAN."

"PASS CHRISTIAN, *March 16th.*

"*My Dear Bert*—You have no need to excuse your not waiting for a reply before writing again. It is not nice, your theory. I don't approve of it at all. You know—or must I say it?—that even were I swallowed in a whirlwind of gaiety instead of being 'all alone at the Pass' your letters would mean quite as much to me. Surely you know that. There are a few things life holds that are not affected by surroundings. Those are the bright things in life. What difference does it make whether it is the 'Mexican Gulf' or the 'Holland House' roof that covers you when you are entirely happy? Not much, I imagine. 'Peace' is sometimes gained only by sacrifice. I have learned that thoroughly. I am glad you had such a good time in New York, and I enjoyed hearing your description of the new plays. Now, tell me honestly, did any of them come up in glory to 'Russell's Comedians?' Nothing you can say will make me change my mind concerning it, anyway. So you don't admire Daly's way of doing away with an overture? You should have said that the three maidens that played looked like triplets, not twins. Three girls cannot possibly look like twins, dear. Poor old fellow, you must not play hand-ball at such a 'black and blue' rate. You'll kill yourself, sure. You must never say or write again that self-reproachful sentence on the first page of your letter. Don't you dare say that you were not good to me. I won't have it,—there! I am delighted to hear that you have again found *your* tune, even if you had to go to Koster & Bail's for it. Do not forget to send me your Mexican address, and while you are in Mexico, if you should see one of those little dogs without any hair on them bring it to me. If I can find your train acquaintance I'll bestow it upon her in place of the coveted monkey. One thing more to scold you about: You must not call yourself names to me. Reserve that for the people who can agree with you. I am doing nothing, so I am uninteresting as a historian. I walk a great deal, and read, and see that the youngster does not drown herself, and wear a path to the post-office looking for mail. I am grateful to you for

remembering me so *sweetly* while in New York. No doubt it will come to-morrow. I feel that by the time you have made out my scrawl that you have found awaiting you, your patience will be sorely tried. But never mind. I will do better 'next time,' and you have always lots of patience with

LILLIAN."

Mrs. Crane, who at the time of the trial had a suit pending for separate maintenance against her husband, the co-respondent, found these letters in his pockets and they were produced in evidence. After Crane's return from the south he had taken his wife to New York, from which place he had communicated with Mrs. Stiles at Pass Christian by letter and by telegram, and, leaving his wife in New York, had returned to Chicago. In pursuit of health he then went to Mexico, and on his return stopped over at Pass Christian, where Mrs. Stiles, and also her mother and sisters, who had arrived there since his previous visit, were stopping, and the whole party returned to Chicago together. Crane left the train before it reached the depot in Chicago, and Stiles did not know that he and Mrs. Stiles had been together at New Orleans or at Pass Christian, or had returned together. The morning after her return home Mrs. Stiles wrote and mailed to Crane the following letter:

"*Saturday Morning.*

"I came home alone last night, the train having been reported four hours late. I found that Nora had made everything nice and comfortable for me. I had some little difficulty in getting here, for the springs to the cab broke as we were about half way and the rest of the journey was anything but comfortable. I was reminded of driving over roots and stumps. This is not what I want to say to you, dearest; it is this: I went to sleep last night lulled by the sweetest recollection, and the last promise I made you *has been* kept and *will be* forever more. My reason for writing this to you is this: when dark fancies enter my mind one word from you can send them into forgetfulness. And I thought you might care to hear me say I am still *yours.*                    L."

"Tuesday afternoon I am going to be down town. Let me hear what time you will care to see me. Monday afternoon's mail."

Crane's family spent the summer of 1892 at their summer home at Lake Geneva, but he remained in the city the greater part of the time, and fell into the habit of taking his breakfast with Mrs. Stiles after her husband had gone to his place of business, and of taking frequent drives with her in the afternoon in his carriage, which he kept in his father's stables near by, and, aside from these letters, the evidence tended to show great intimacy between them. Upon the invitation of the Cranes, Mr. and Mrs. Stiles visited them at Lake Geneva July 2, 1892, to remain over the Fourth. Stiles was reluctant to go, but was prevailed upon by his wife, and with the view, as understood, to bring about a reconciliation between Mr. and Mrs. Crane,—the two families having before that time been exceedingly intimate and friendly. It seems to have been arranged by Mrs. Crane that Mrs. Stiles with her child should occupy the room with her, but Crane removed her luggage to another room at the end of the hall, where he also took her child, and directed that Mrs. Stiles should occupy that room, giving as his reason that if the two women occupied the same room they would lie awake and talk until a late hour, and both would be sick in consequence. Crane and Stiles slept together in the same bed, in another room. What occurred during the night can be better stated by quoting the testimony of Mr. and Mrs. Stiles and Mrs. Crane. Crane did not testify.

Testimony of Everell D. Stiles: "I awakened in the middle of the night and noticed that Mr. Crane was not by the side of me in the bed. I got up and opened the door looking down the hall. I stood there a minute listening, and while I stood there the door of Mrs. Stiles' room opened and Mr. Crane came out. He had on no clothing except his night shirt. It was after midnight. I immediately rushed into Mrs. Stiles' room and found her sitting up in bed wringing her hands and crying. She said she had been awakened by Mr. Crane standing

by her bed looking at her, and that she had ordered him out of the room. She was quite hysterical. The child was there crying. She awoke after I went in the room —was awakened by our talking. I asked my wife what Crane was doing in there. She said she did not know— that she was awakened by his looking at her. While we were talking Mrs. Crane came in and wanted to know what was the matter, and on account of her condition I told her that nothing was the matter. I tried to quiet her. She had been sick that night—had fainted. I have told everything that happened, except my trying to quiet Mrs. Crane, and the two women explained this thing to me afterward. We thought that Crane was crazy at this time." On cross-examination he said: "The door of my room was ajar when I got up. I pushed it a little further open and listened. I saw Crane open the door and come out of Mrs. Stiles' room. Her door was not entirely closed. I could see a rim of light at the edge. I stayed in Mrs. Stiles' room five or ten minutes, and then she went to Mrs. Crane's room. I next saw Mr. Crane in the room we slept in. I went back there to bed, and he came and told me he had seen a light in Mrs. Stiles' room and thought something was the matter and had gone in there. I slept with Crane until morning. I did not then think there was anything wrong between Crane and my wife. I believed her—that was the size of it. I remained at Crane's home until the fifth of July, sleeping each night while there with Mr. Crane."

Mrs. Crane's testimony: "Previous to retiring Mrs. Stiles had put her little girl, Polly, in my room, and soon after Mrs. Stiles bade us good night I went upstairs, and found Mr. Crane carrying Mrs. Stiles' luggage into the blue room. I asked Mrs. Stiles what the meaning of it was, and she said that Mr. Crane said that we should not sleep together that night,—that we would talk all night and have a headache next day. I went into Mrs. Stiles' room after preparing for bed and lay on the bed with

Mrs. Stiles and talked to her until twelve o'clock, and then went to my own room, and about two o'clock was awakened by a disturbance of some kind. I opened my door and looked out in the hall and saw Mr. Crane standing about a foot from Mrs. Stiles' door in his night dress. I walked through the hall, and as I started to go into Mrs. Stiles' room he started to come past me, and I asked what was the matter, and he did not answer me. I went into the room and saw Mr. Stiles there, and saw Mrs. Stiles sitting in her bed wringing her hands and crying. The little girl was just waking up and crying, and I asked what was the matter, and Mr. Stiles said, 'O, nothing; go back to bed.' I said, 'Why, what is the matter?' and Mrs. Stiles said, 'If he will not tell you I will,' and said she was awakened by somebody standing by her bed. It was Mr. Crane, and she said to him, 'Bert Crane, you get out of this room!' and he started to go out of the room and met Everell coming in, and she said, 'You can imagine my predicament.' Then I begged Mr. Stiles to keep quiet. He wanted to know what time the first train left, so that he could get out of the house. I did not think of anything but the disgrace to the family. Mrs. Stiles said she would go back to my room; she would not sleep there alone; she would go back there for protection. She came back to my room and remained for the rest of the night. We talked about it after we reached my room. She said that after all that she had done for Bert Crane for him to disgrace her in that way! She said that Ev. Stiles would never forgive her, never forgive him; that he never could come to the house again, and that it would be the breaking up of our friendship. She seemed in a frightfully nervous condition, and said that for my sake she would treat him politely until she left the house, but would never allow him to come to her house again. I did believe that night that Mrs. Stiles was innocent, and I presume I told her so. I thought my husband would be disgraced. I did not think Mrs.

Stiles would be disgraced at that time. I believed that my husband was guilty, but that she was not. I did not believe that she had committed adultery that night with my husband. From all that occurred that night I did not believe that Mrs. Stiles was guilty of any impropriety. After that occurrence and during the same month I again invited Mrs. Stiles to my house."

Mrs. Stiles' testimony: "After we went upstairs to bed Mrs. Crane told me I was to sleep in the blue room. I then went into Mrs. Crane's room and lifted my little girl out of the bed and took her into the room where I was going to sleep. I wrote some letters, and Mrs. Crane sat in my room and chatted with me while I was writing them; then she went into her room and put on a night dress and came back into my room. We sat and talked a while, and then we pushed the baby onto the east side of the bed and laid on the bed and chatted quite a while. Talked about various things—about her troubles and about different things,—and then she said she would go back to bed, because, she said, 'we are doing the very thing that Bert does not want us to do: we are talking away into the night.' When she started to her room I got up and turned up the gas as high as I could without its flaring, and took a book to read, because my head troubled me and I was nervous, and I thought perhaps I would quiet myself by reading. It is my habit to do so. I read for a little while, and was conscious of the book falling on the floor. When Mrs. Crane went out she left the door of my room half open, but I did not get up to shut it because no one could see the bed from the hall. The door was fully half open. I fell asleep while reading. I simply remember the book dropping out of my hand and my being too sleepy to remember about the gas. I did not turn out the gas. The first thing that woke me was Mr. Stiles grasping my shoulder and shaking me. He said, 'What was Bert Crane doing in this room?' I collected myself for a moment and said, 'If

Mr. Crane was in here, find him and ask him.' When I awoke the gas was turned low. Mr. Stiles said to me, 'You are as innocent as that young one, (pointing to my baby,) but if you ever attempt to leave me I will make people think you are not.' Then Mrs. Crane came into the room and asked what was the matter. Mr. Stiles passed out of the room. I heard no conversation between Mr. Stiles and Mrs. Crane, but Mrs. Crane came into my room and shut the door after her. She stood at the foot of the bed after Mr. Stiles had gone, and I said, 'Did you hear what that man said to me?' She said, 'I did not.' 'Well,' I said, 'I will tell you,' and I repeated what Mr. Stiles said to me—that if I ever attempted to leave him it would be easy to make people think I was guilty with Mr. Crane present in that room, although I was as innocent as that young one. Mrs. Crane said, 'Never mind; I know just exactly how things are, and if he ever attempts to make you any trouble, call on me, and I will tell a different story.' Then she said, 'You come into my room for the rest of the night,' and I said, 'Very well; I will,' and she passed through into her room and I picked up my little girl and followed."

Soon after Mr. and Mrs. Stiles returned home Mrs. Stiles wrote to Mrs. Crane the following letter:

"*Sunday, July 10.*

"*My Dear Jessie*—Would that my pen might borrow sufficient eloquence to paint in words all that is in my heart. Who is there in this world of ours who can tell the best that lies within them, or the worst? What philosopher can transfer heart thought, soul impressions, upon paper? I hesitate lest an ill-chosen word may give you pain or a clumsy sentence touch upon a sensitive chord, and cause you to think me, at the least, indelicate, for what I have to say touches you so closely that I am even now sorrowful in the thought that it must be written, not spoken. It is so much easier to talk to you. I am willing, at last, to do that which I have long been striving to persuade myself would never be necessary—make an acknowledgment that is woefully reluctant to pass my lips. I have failed in my endeavor to make Bert see his duty. I have ignominiously

failed. My girl, I am going to ask you simply to do one thing—believe, whatever happens, that my efforts have been honest ones. I ask you nothing else. I have used what poor words were mine to show him his error, the wrong to his children, and all the rest. What my appeals lacked in word glory they made up in heart eloquence, surely; but it is of no avail—useless to exert myself further. Let me be blunt with you, Jessie; let me be honest, to the point of clear understanding. Whatever I have striven to show Bert was to his advantage. When I have pointed him clearly his path of duty, it was because I wished to see him do right, to do what was worthy, to do what was manly, honorable. All this was not simply because you were my friend or that I was alone interested in his family; it was because I was interested first in Bert. I confess freely he has been my center of interest from the first. My first thought was always a hope of his re-established home happiness. For many weeks I forced myself to believe that much of his bitterness, his un-yieldingness, was due to his health. My dear, I am this moment ignorant of the true cause of the first strain upon your domestic relations; but this I do know, that you were not all in all to Bert for a long, long time,—much longer than you or I have guessed. I spoke to Bert in regard to last summer, and asked him when he found himself slipping away from his home life why he did not seek a friend for advice and sympathy, and thus save himself his self-inflicted misery. I said, 'I would have done all that was in my power to help you.' He said, 'You would have had to begin much further back than that to have done any good.' So you see, my girl, things were going quite as badly,—yes, much worse,—for you long before I came in action upon the scene.

"Bert has become more or less dependent upon me for what pleasure he gets in town. By that I mean, he would rather come here than go elsewhere, and he feels that a drive or the play in my company is at present very essential to his well-being. I don't think just now I have the heart to forbid him what is to him now his one pleasure while in town. I do not think I ever felt such a supreme sorrow for any one in my life as this day fills my heart for Bert. He is a man of such unde-cided purpose. He simply utterly refuses to interest himself in other things. He is wretched, ill, unhappy in himself. He needs some consolation—some sympathy. Do you not think so? He is this day fighting against his better self, against his better judgment. Even now something whispers that what is good

will triumph. He needs as much watching and care as a weary, over-burdened child. True, he has brought much of his trouble upon himself, but it makes it no easier to be borne. Do not think in my pity for him that I allow myself to forget your wrongs and sufferings. They are never absent. All I say this for is to tell you that at whatever the cost may be to me, I am unwilling to add one jot to the misery and sorrow that already weighs Bert down, and if in the small ways that I have mentioned I add to his comfort, I am ready to do what I can.

"Do you understand just how run down and miserable he is? He is positively unfit for anything save rest. If any one could persuade him to remain away from town for a few weeks it would do much for him. I think you had best use your influence, indirectly. I am not writing this to cause you any added uneasiness, but it is so. I am determined never to mention you or your children to Bert again, for I am convinced that if my previous entreaties are worthless my added prayers would end in nothing. Nothing seems very easy for me just now, but you've trouble enough without my contributing any of mine. I do not think Bert intended talking to you to-day, but it is merely surmise. This you must understand: just the moment I feel that in seeing no more of Bert I am doing you any good or am drawing him nearer to you, just that moment, at the complete sacrifice of anything it might mean to him or me, it shall be done; but until that time I shall do all that lies within my power for his comfort. Trusting that it will take not the smallest atom from your well-being,          LILLIAN."

After frequent quarrels between Mr. and Mrs. Stiles, and threats upon her part that if he would not leave she would, he left her on July 15, 1892, and wrote to Mrs. Crane the following letters:

"CHICAGO, *July 15, 1892, 12 M.*

"*My Dear Jessie*—Lill said that she was going to see you yesterday, but as she did not take the train I telegraphed you last evening, but so far have no answer. Regarding Bert, Lill will pay no attention to my wishes, and seems to try to do that which will bring about a separation between us. I can stand it no longer, and see now that there can be but one result. Your prophecy wasn't correct. While I am made very unhappy I can't see that she will gain, and the only reason I can give for her actions is, that she is suffering some mental disorder. I am sorry that this could not have been ended and that a little jus-

tice would have been shown both of us. I hope that you will come through your sickness all right. I can't yet say where I will go or what I will do. Write me if Lill is with you or not.

"Truly,                              Ev."

"CHICAGO, *July 18, 1892.*

"*My Dear Jessie*—Your letter received and destroyed; please do the same with this. I have left, but not of my own free will. If I had not gone Lill would have, and you know 'tis better that I should go. Lill does not love me, and has told me that she has not for some years. My heart is broken, and I don't know what I shall do yet. Lill wants me to stay with the old folks, and I have for the last two nights, but couldn't tell them that we had separated, so have told them she was with you. We did not have a stormy time, but I packed my valise and went, bidding her good-by. I really can't understand why I should take it so to heart. I can't see how my living under a different roof will do her any good, but under the circumstances you can see I cannot be near her to protect. I have told her that what was ours is now hers, and have nothing, no home, and really feel an outcast. I know that I have your good wishes, and know that I will get more than my share of sympathy. The fault is mine to a great extent, and perhaps I am only reaping that which I have sown; but then you know how unkind people will be and the mean things that will be said to hurt Lill. Please don't say a word to any one about what has happened, and I will try and keep the fact that I have no wife or home quiet as long as I can. Tear up this crazy letter and forgive me for troubling you.

"Yours truly,                       Ev."

"I will not stay with the old folks only until I can settle in some way.—Ev."

A short time after their separation, Stiles, while at lunch with one Wardrop, with whom he was on terms of intimate friendship and who had been a·frequent visitor at his house,—not only when he was at home but in his absence as well,—told him (Wardrop) of his domestic troubles, and Wardrop, at his request, promised to talk with Mrs. Stiles, with the view of bringing about a reconciliation. Shortly thereafter, and about two weeks after he had left his wife, he returned to his home, because, as he testified, he thought it was very foolish to

stay away from his own home.   He undertook to unlock
the door to his apartments with the key he had formerly
used, but found the door bolted.   The noise he made in
his efforts to get in and by rapping at the door caused
Mrs. Stiles to appear and open the door.   Upon enter-
ing he found Wardrop sitting in the back parlor in his
shirt sleeves.   Stiles ordered him to leave the premises
immediately, and refused to listen to his attempted ex-
planations that he was there in the performance of his
mission as a mediator, under his promise made at Stiles'
request, and had been permitted by Mrs. Stiles to re-
move his coat because of the excessive heat.   Stiles de-
clined to listen, saying he did not want to hear any of
his "damn explanations," and after a heated altercation
and mutual threats Wardrop left the house, and soon
after Mrs. Stiles called a cab and departed also, and
went to the house of Mrs. Elliott, an acquaintance, and
never thereafter returned.   From Mrs. Elliott's she im-
mediately sent the following letter to one John B. Corey,
a friend of herself and Crane:

"*My Dear Jack*—I am in no end of trouble, and you must
help me.   I want to see Bert and talk to him the moment he
comes in town.   The train gets in from the Lake at 9:45 A. M.,
but Bert usually gets off at the west side.   Now, what I am
going to ask you is no light task, Jack, but somehow I expect
you will not refuse me.   Go to the west side, board the train,—
that is, if Bert does not get off,—see him, and tell him to come
to the parlor of the Auditorium at once.   I will wait for him
there.   They can tell you at the Northwestern depot just where
the train slacks up to allow parties who wish to get off at the
west side.   Now, Jack, do this for me and I shall never cease
being thankful.   I am with Mrs. Snell.

"Yours always,          LILLIE."

Crane met her, as requested, at the Auditorium Hotel.
Shortly afterward Mrs. Stiles rented apartments in the
Valparaiso flats, on Wabash avenue, and furnished them
with money borrowed, upwards of $500 of it from Crane
and about the same amount from her mother.   She occu-

pied this flat alone, with Mrs. Allen, the wife of the jani-
tor of the building, intending, as she testified, to keep
boarders, but Crane was her only boarder.   He took his
meals there, paying her from $45 to $75 per month, ac-
cording to the cost of the articles of food with which he
was served.   It seems that his health and appetite were
precarious, and he required fruit out of season, and other
diet which was often expensive.   Their drives together
in the afternoons continued, and their attendance upon
the theater in the evening became a regular custom with
them.   They took a trip to Cuba together in the spring
of 1893.   Aside from their constant association as above
stated, many incidents denoting undue familiarity were
related by different witnesses, which, so far as deemed
necessary or important, are stated in the opinion of the
court.

WILLIAM J. BULGER, and WALKER, JUDD & HAWLEY,
for plaintiff in error:

The offense of adultery is sufficiently proved by cir-
cumstances which raise the presumption of cohabitation
and unlawful intimacy.   2 Greenleaf on Evidence, secs.
40, 41, 43; Hurd's Stat. p. 464, sec. 12; *Loveden* v. *Loveden*,
4 Eng. Ecc. 461; *Cadogan* v. *Cadogan*, id. 462; *Chambers* v.
*Chambers*, id. 445; *Daily* v. *Daily*, 64 Ill. 329; *Bast* v. *Bast*, 82
id. 584; *Scarls* v. *People*, 13 id. 597; *Carter* v. *Carter*, 152 id.
434; 37 Ill. App. 219; *Cooke* v. *Cooke*, 152 Ill. 286; 2 Bishop
on Mar., Div. and Sep. secs. 1351, 1355, 1361, 1363, 1370,
1388; Bishop on Stat. Crimes, secs. 677, 679, 680; 5 Am. &
Eng. Ency. of Law, 785, note 1; 2 Bishop on Marriage
and Divorce, (5th ed.) secs. 613-615; id. (6th ed.) 616, 617,
619, 625, 629, 630; *State* v. *Chancy*, 110 N. C. 509; *Thayer* v.
*Thayer*, 101 Mass. 111; *State* v. *Austin*, 108 N. C. 780; *Black*
v. *Black*, 30 N. J. Eq. 229; *State* v. *Rinehart*, 106 N. C. 787;
*State* v. *Eliason*, 91 id. 564; *State* v. *Christmas*, 101 id. 749;
*Bailey* v. *State*, 36 Neb. 808; *Jeter* v. *Jeter*, 36 Ala. 391; *State*
v. *Poteet*, 8 Ired. 23; *Allen* v. *Allen*, 101 N. Y. 660; *Moller* v.

*Moller,* 115 id. 466; *Inskeep* v. *Inskeep,* 5 Iowa, 208; *Names* v. *Names,* 67 id. 383; *Mehle* v. *Lapeyrollerie,* 16 La. 4; *Ferguson* v. *Ferguson,* 30 N. Y. Sup. 309; *Warren* v. *Warren,* 29 id. 313; *Berckmans* v. *Berckmans,* 16 N. J. Eq. 125.

Adultery need not be proven beyond a reasonable doubt, but need only be established by a preponderance of evidence. *Carter* v. *Carter,* 62 Ill. 439; *Chestnut* v. *Chestnut,* 88 id. 548; *Smith* v. *Smith,* 5 Ore. 186.

To prove adultery by circumstantial evidence two points are to be established: the opportunity for the crime and the will to commit it. Where both are established the court will infer the guilt. It is not an unnatural presumption that if parties are guilty of adultery they will not hesitate to resort to perjury to conceal their guilt. *Berckmans* v. *Berckmans,* 16 N. J. Eq. 125.

The abandonment of a husband's bed by a wife without justifiable cause lends additional weight to suspicious circumstances against her and tends to give them an unfavorable construction. *Jeter* v. *Jeter,* 36 Ala. 391.

Criminal desires may be inferred from strong expressions of attachment, stolen interviews and a clandestine correspondence. *Black* v. *Black,* 30 N. J. Eq. 228.

Proof that the parties have carried on a clandestine correspondence, made strong expressions of attachment and held secret interviews will furnish very strong evidence of criminal inclinations and desires. 2 Bishop on Marriage and Divorce, sec. 616.

The charge of cruelty, though proven, is not a recriminatory defense to the charge of adultery. *Bast* v. *Bast,* 82 Ill. 584; *Dillon* v. *Dillon,* 32 La. Ann. 643; *Huling* v. *Huling,* 38 Ill. App. 144.

BARNUM, HUMPHREY & BARNUM, S. P. SHOPE, and SAMUEL ALSCHULER, for defendant in error:

False accusations of unchastity, made by a husband without sufficient cause, constitute cruel and inhuman treatment. *Sharp* v. *Sharp,* 116 Ill. 512; *Ward* v. *Ward,* 103

id. 477; *Kennedy* v. *Kennedy*, 73 N. Y. 369; *Farnham* v. *Farnham*, 73 Ill. 497.

The charges of adultery must be shown by proof of acts and circumstances that convinces the mind by a preponderance of its weight, and not by mere suspicion or conjecture from vague circumstances, pointing to no specific time, place or act. *Carter* v. *Carter*, 62 Ill. 439.

When immorality or wrong is imputed, such as adultery, it must be established by at least a preponderance of proof; and when the facts and circumstances relied upon to establish the same may as well import innocence as guilt, they must be held to import innocence. *Carter* v. *Carter*, 62 Ill. 439.

Though presumptive evidence alone is sufficient to establish the fact of adultery, the circumstances must lead to it, not only by fair inferences, but as a necessary conclusion. Appearances that are equally capable of two interpretations will not justify the presumption. *Pollock* v. *Pollock*, 71 N. Y. 141.

To establish the charge of adultery facts proven must be such as cannot be reconciled with probability and the innocence of the parties. *Berckmans* v. *Berckmans*, 16 N. J. Eq. 122.

It is not sufficient to entitle a party to a divorce upon the ground of adultery, to prove that the defendant, who might be supposed willing to commit the adultery, was in a position in which it was possible to commit it. It must be shown that the defendant and the party with whom the adultery is charged to have been committed were together under suspicious circumstances which can not be easily accounted for unless they had that design or which could not be well explained without it. *Mayer* v. *Mayer*, 21 N. J. Eq. 247.

Proof that the parties were together in a place and at a time where and when it was possible for them to have been guilty is not sufficient to establish the charge of adultery. *Freeman* v. *Freeman*, 31 Wis. 235.

Mr. JUSTICE CARTER delivered the opinion of the court:

After a careful consideration of the record in this case, and upon both oral and written arguments, we have arrived at the conclusion that the decree entered by the learned chancellor in the Superior Court is erroneous. We are satisfied with the decree in so far as it found that the evidence was not sufficient to sustain the allegations of the cross-bill that the plaintiff in error had been guilty of extreme and repeated cruelty to his wife; and in support of the charge of adultery against him no evidence whatever was introduced. We have no doubt, from the evidence, that, even before he suspected her of actual infidelity, the many instances which the evidence shows Stiles became aware of when Mrs. Stiles failed to observe that sense of propriety in her association with her friends of the opposite sex which, as a wife and mother, it was her duty to observe, caused him to use harsh language to her, and on one or more occasions to resort to slight physical violence, but the evidence falls far short of establishing the charge of extreme and repeated cruelty. Besides, the law is well settled in this State that extreme and repeated cruelty is not sufficient as a recriminatory defense to the charge of adultery. *Bast* v. *Bast*, 82 Ill. 584.

That the letters, and the facts and circumstances set out in the preceding statement of the case, show that an undue and improper intimacy existed between Mrs. Stiles and Crane would seem too plain for controversy. Whether they alone would be sufficient to establish the charge of adultery it is not necessary here to determine, for the reason that many other incriminating facts appear in the evidence, which, when taken in connection with these letters and the incidents connected with them, lead with relentless force to the conclusion that the charge is true. It may not be true that they committed adultery on the second of July, at the home of the Cranes at Lake Geneva; but if no criminal relations had previ-

ously existed between them, the evidence showed a rude
invasion by Crane of the privacy of Mrs. Stiles in her
bed chamber at a late hour of the night, when he had
every reason to know, or at least to believe, that all
others in the house were then in deep sleep, and which,
when taken with the previous clandestine meetings be-
tween them and her letters showing their affectionate re-
lationship, together with the conflicting accounts which
she gave of the incident,—one to her husband and Mrs.
Crane on the same night after the occurrence and the
other on the witness stand, the former inculpating Crane
and the latter exculpating him,—and her letter to Mrs.
Crane written only eight days after the event, and her
subsequent intimate relations with Crane, tend with
much force to show the willing mind on the part of both,
although the circumstances may also show that the occa-
sion mentioned was inopportune for the actual commis-
sion of the act. That he did go into her bedroom on this
July night in a state of undress and under the suspicious
circumstances shown by the evidence is not only clearly
established, but is not even denied or in any way ex-
plained by him. That, if his purposes were not evil, he
was subjecting Mrs. Stiles and himself to the worst pos-
sible misjudgment, and was taking every risk of deeply
offending her as well as her husband, as a man of ordi-
nary intelligence he must have known. That she was
not, by all that occurred, really offended by his act and
did not thereafter avoid him is also clear. That she did
a few days afterward, in her remarkable letter to Mrs.
Crane, express her deep and long-continued interest in
Crane, and declare, in language though somewhat veiled
yet in meaning unmistakable, her purpose not to give
him up but to cling to him, is also beyond the realm of
controversy. After the separation from her husband,
which occurred within two weeks after the episode at
Lake Geneva, her intimacy with Crane increased, and
their constant association became such, and under such

circumstances, that as a woman of intelligence, as the evidence shows her to have been, she could not help but know that by the common consent of the community but one opinion, and that the worst, would inevitably prevail as to her relations with Crane. We cannot believe that an innocent woman would so demean herself. Even if, in favor of innocence, the theory could be advanced that because of uncongeniality or unkindness of her husband she had become estranged from him and had become enamored of Crane, and indulged the hope that some day all obstacles to their marriage might be lawfully removed, still, as a woman free from actual guilt, she would necessarily have been all the more circumspect in her conduct with him. It is no answer to say that both Stiles and Mrs. Crane believed at the time that Mrs. Stiles was innocent. It is clear that Stiles was loth to believe her guilty, and it was no discredit to him that he retained his faith in his wife until the evidence of her unfaithfulness was all but conclusive. As before said, it may be true, and the circumstances may have been such, that no act of adultery was or could, without detection, have been committed on the second of July, and as matters then stood—the evidence of the letters and many other incriminating circumstances contained in the record being then unknown to them—Stiles and Mrs. Crane might well have refused to believe in any impropriety on the part of Mrs. Stiles.

The trial of the case occupied the attention of the court many weeks, and the volume of evidence is so great that no extended review of it can be here made, but it is proper that such additional facts not hereinbefore sufficiently set forth, in connection with those already mentioned, should be adverted to.

Only a few months before the incident on the night of the second of July, and the next morning after her return from the south with her mother and sisters and in the company of Crane, in a letter to Crane Mrs. Stiles wrote

this: "This is not what I want to say to you, dearest; it is this: I went to sleep last night lulled by the sweetest recollection, and the last promise I made you *has been* kept and *will be* forever more. My reason for writing this to you is this: when dark fancies enter my mind one word from you can send them into forgetfulness, and I thought you might care to hear me say I am still *yours*. Tuesday afternoon I am going to be down town. Let me hear what time you will care to see me. Monday afternoon's mail." In her testimony Mrs. Stiles attempted to explain this letter by saying that the promise referred to which she had made to Crane was to tell her husband of her trip to New Orleans to witness the Mardi Gras festival and of what had occurred there, and if he were angry at her for leaving Pass Christian, as it was understood she was not to do, that she would bear with his anger, and after a full explanation endeavor thereafter to make the best of her lot in life and continue to live with him. She also testified that in that conversation with Crane, before she made the promise, she had told him for the first time of her domestic unhappiness, of her husband's suspicions of her, of his harsh language and overbearing conduct toward her, and of her purpose to leave him and go to her mother, but that Crane induced her to continue, for a while at least, with her husband, and that she had promised him to do so. In view of all the evidence we regard this explanation as wholly unreasonable and its truth improbable. The letter itself is susceptible of no such interpretation, and the subsequent conduct of Crane and herself, taken in connection with the terms employed in the letter, leads to the only reasonable conclusion: that she had promised Crane that her devotion thereafter should be to him rather than to her husband. Even if she had promised a man of Crane's characteristics that she would try to regain her husband's confidence and to continue thereafter to perform her duty as his wife and the mother of his child, it is hard to be-

lieve that she could, under the influence of such senti-
ments of honor and duty, have in so short a time written
to Crane such a letter showing such a complete surrender
of her affections to him, and giving as a reason for writ-
ing that she thought he might care to hear, not that she
was striving to do her wifely duty, but, to use her em-
phasized words, "to hear me say I am still *yours*," and
ending with a postscript requesting him to fix a time
when he could meet her "down town."

The events that followed each other in such rapid
succession after this letter was written, leading up to the
separation between herself and husband and showing her
intimate relations with Crane, are wholly inconsistent
with her explanations made as a witness in her own be-
half, and are far more consistent with the view that she
had promised Crane to break finally with her husband.
It is seen that immediately upon the separation she wrote
to Corey, a mutual friend of herself and Crane, request-
ing him to go at once to the train upon which she ex-
pected Crane to arrive from Lake Geneva, intercept him,
and to tell him to meet her at a certain hotel. The
meeting took place as arranged. Whether or not at this
meeting it was planned between them to take up their
abode together can but be determined by their subse-
quent conduct. After a short trip north she returned,
and instead of going to live with her mother and sisters,
who kept house and lived in comfortable circumstances
in Chicago, as she testified she had on her return trip
from the south told Crane she intended to do, she rented
a flat and furnished it with money a large proportion of
which was provided by Crane, and took up her abode
ostensibly alone, having only a housekeeper with her,
with the intention, as she testified, of keeping boarders.
But she had no boarder but Crane. While the evidence
tends to show that she obtained considerable sums of
money from her mother, yet in addition to providing
money to aid in furnishing the flat, Crane paid her vary-

ing amounts for his meals which he took with her, ranging from $45 to $75 per month, and though left in some uncertainty, the evidence tends to prove that he guaranteed the payment of the rent also. While she testified that she paid the rent herself and repaid to Crane all the moneys he advanced to her, we think it is fairly deducible from the evidence that the establishment which she set up was supported principally at Crane's expense. But be that as it may, the life they led during her occupation of this flat was, under all of the circumstances, judged by the common observation of men and by the rules of evidence, wholly inconsistent with that virtuous conduct which she testified that she and Crane always observed. While it was not his habit to occupy lodgings at this flat occupied by Mrs. Stiles, and she and her housekeeper, Mrs. Allen, testified that he did not occupy a room there but two or three nights, still he was with her, there and elsewhere, nearly every day and evening. They drove together constantly, attended the theater together evening after evening, and on their return he would stay until late into the night, and on one occasion, when watched by others, he remained all night. This occurrence she explained by testifying that they observed some brutal-looking men loitering about the house watching it, and that she prevailed upon Crane to stay as a matter of safety to himself, and to bear witness to her innocence should it be assailed. It was assailed, but Crane sat silent at the trial under the imputation, and suffered her to bear the burden of explaining the occurrence as best she could. Witnesses testified that during their occupancy of this flat Crane and Mrs. Stiles were seen kissing and caressing each other, and on one occasion, near two o'clock in the morning, there was a disturbance in the hallway caused by the arrest of a burglar or else a drunken man, which caused a number of the occupants of the several flats opening into the hall to come into the hall; that among them were Crane and Mrs.

Stiles, who presented the appearance of having hastily and incompletely dressed themselves. Mrs. Stiles admitted the incident, but denied that they were not properly dressed, and testified that they were disturbed by the noise in the hall while they were engaged in a game of parchesi, and that nothing improper had occurred between herself and Crane.

In February, 1893, Mrs. Stiles took another trip to the south. It does not expressly appear that the trip was planned with Crane, but it does appear that he preceded her and went on a hunting trip to some point in the State of Mississippi, and was at the railroad station at Holly Springs when the train upon which Mrs. Stiles and others, some of whom were acquaintances of hers, were then passengers. She testified that she had no agreement to meet Crane there, but she admitted that she thought he might possibly be there. Her actions, as shown by the evidence, indicated that she expected to meet him at that point, and there can be no doubt, from the facts disclosed, that they met by appointment. Crane accompanied her from Holly Springs to New Orleans, and one witness testified to acts of Crane while seated beside her in the car, of undue familiarity between them. These acts were not seen by other witnesses called, who testified that Crane sat in the same seat with her but that they saw no improper familiarity between them. The entire party stopped at the same hotel at New Orleans, and after spending several days in that city, upon Crane's invitation Mrs. Stiles went with him and others to Cuba. Aside from being constantly, and usually exclusively, in each other's society, and at places and under circumstances affording opportunities for illicit intercourse, no such act, nor any indecent act, at New Orleans or in Cuba, or on the way there, or back to Chicago on their return trip, which they made together, was shown. During her absence the flat which she had occupied in Chicago was injured by fire, and on her re-

turn she took and furnished a room in the flat occupied by her mother and sisters on Oakley avenue, where Crane continued to visit her as before. He passed much of his time with her and kept his dress suit there. One witness testified that while she was occupying this room he (witness) lived in rooms facing it, across the street, and that he saw Crane in her room at night, and saw them embracing and kissing each other and lie down across the bed together. Two other witnesses testified to seeing them kiss each other while she lived there. Many other acts of undue familiarity were testified to by other witnesses as having taken place at other times and places, which swell the volume of proof against defendant in error and the co-respondent. One of the most important of these, indicating guilt, occurred shortly before Mrs. Stiles separated from her husband, in July, 1892. The superintendent of certain buildings, among which was the one in which Stiles lived, was sent to repair a door to Stiles' bath-room. He testified that while engaged in that work, between nine and ten o'clock in the morning, after Stiles had gone to his place of business, he saw Crane, dressed only in his night shirt, open the door of Mrs. Stiles' bedroom from the inside and start to come out, but on seeing witness quickly closed it. Other testimony showed that Crane was a visitor there at that time, and that he frequently took breakfast with Mrs. Stiles after her husband had gone to his daily work.

After the trial had commenced in the Superior Court, Mrs. Stiles, accompanied by Crane, went to St. Charles, in Kane county, where she rented a house and took up her abode. She testified she was advised by her physician to seek a home outside of Chicago for the benefit of her health, and gave as another reason that her mother and sisters desired and intended to spend a part of their time with her there. But it does not appear that they did so. Crane took up his abode there also in the same house, and he and Mrs. Stiles continued their associa-

tion, going to and returning from Chicago together while in attendance upon the hearing of this cause in the trial court.

As before indicated, we shall not undertake to review, nor even to advert to, all the incidents detailed in this voluminous record which combine to establish the guilt of Mrs. Stiles of the charges made in the bill of complaint. We have referred to a sufficient number of particular acts, which we think were proved by the evidence, which, in connection with the long-continued and admitted improper association of these persons and their affectionate correspondence, establish the fact of adulterous intercourse between them with too much certainty to be ignored. It is sufficient here, as in other civil causes, if the allegations of the bill are sustained by a preponderance of the evidence.

It is the generally conceded rule, and one even adopted in the Criminal Code of this State, that the offense of adultery shall be sufficiently proved by circumstances which raise the presumption of cohabitation and unlawful intimacy. (Rev. Stat. p. 354, sec. 12; *Daily* v. *Daily*, 64 Ill. 329; *Bast* v. *Bast*, 82 id. 584.) See, also, 2 Greenleaf on Evidence, secs. 40, 41, 43, where it is said: "The nature of the evidence which is considered sufficient to establish the charge (adultery) before any tribunal has been clearly expounded by Lord STOWELL, and is best stated in his own language: 'It is a fundamental rule,' he observes, 'that it is not necessary to prove the direct fact of adultery, because, if it were otherwise, there is not one case in a hundred in which that proof would be obtainable. It is very rarely, indeed, that the parties are surprised in the direct fact of adultery. In every case, almost, the fact is inferred from circumstances that lead to it by fair inference as a necessary conclusion, and unless this were the case and unless this were so held no protection whatever could be given to marital rights. * * * The only general rule that can be laid down upon the subject is,

that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion, for it is not to lead a rash and intemperate judgment, moving upon appearances that are equally capable of two interpretations, neither is it to be a matter of artificial reasoning, judging upon such things differently from what would strike the careful and cautious consideration of a discreet man.' * * * Upon such subjects the rational and the legal interpretation must be the same."

While we are loth to disturb the findings of the learned chancellor of the Superior Court, who gave to the case such a thorough and patient hearing, and who, seeing the witnesses and hearing them testify, had better opportunities than we can have of detecting falsehood and discerning the truth, still, entertaining an opinion, from the evidence, so different from that arrived at by him, and by the Appellate Court in affirming the decree, that decree as entered cannot be permitted to stand. We are of the opinion that plaintiff in error is entitled to a decree of divorce and to the custody of his child.

The judgment of the Appellate Court and the decree of the Superior Court are both reversed, and the cause is remanded to the Superior Court, with directions to enter a decree in accordance with the views we have expressed, finding defendant in error, Lillian B. Stiles, guilty of the charge of adultery with Herbert P. Crane, dissolving the bonds of matrimony between plaintiff in error and defendant in error on that ground, and awarding the custody of the child mentioned in the bill to plaintiff in error, Everell D. Stiles, and dismissing the cross-bill of defendant in error for want of equity.

*Reversed and remanded.*