## J. CLARENCE LINDSAY
### v.
## PEARL F. LINDSAY.

*Opinion filed February 21, 1907—Petition for rehearing withdrawn.*

1. DIVORCE—*decree dismissing bill is res judicata as to then existing grounds for divorce.* A decree dismissing a bill for divorce filed by the wife is, while it remains in force, *res judicata* of everything that was or might have been alleged by her as ground for divorce at the time the bill was filed.

2. SAME—*what does not justify a wife in living apart from her husband.* A wife is not justified in living apart from her husband because he accused her of unlawful intimacy with a man whose association with her he had objected to, where the accusation was based upon the conduct of the wife in allowing the man to remain over night in a cottage of which she and two small children were the only occupants, and where she made no attempt to explain her indiscreet conduct or assert her innocence of any wrongdoing.

3. SAME—*when wife is guilty of desertion.* A wife who leaves her husband after a quarrel over her indiscreet conduct and remains away for over two years notwithstanding the husband's repeated efforts to induce her to return, and who refuses at all times to return and shows no desire for a reconciliation, never going further than to intimate that she might return at some future time if the husband complied with conditions which she had no right to impose, is guilty of desertion.

4. SAME—*what is not a condonation of wife's desertion.* The facts that after more than two years' unjustifiable absence the wife returns to her husband's home and that she lives in the same house with him do not amount to a condonation of her desertion, where she had no intention of resuming, and did not resume, her marital relations with him, but employed detectives to watch her husband and devoted her energies to unearthing some cause which would entitle her to a divorce from him.

5. SAME—*when the Supreme Court will not award a new trial.* Upon reversing a decree dismissing a husband's cross-bill for divorce, if there are no errors of law to be corrected and it is manifest that the husband is entitled to a divorce, and that the ends of justice will not be served by another trial the result of which is certain, the Supreme Court will remand the cause with directions to the trial court to enter a decree of absolute divorce, and to make such order as to the custody of the children as is just and equitable.

HAND, WILKIN and CARTER, JJ., dissenting.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. M. KAVANAGH, Judge, presiding.

WATERMAN, THURMAN & ROSS, for appellant:

The alleged charges of the wife's adultery, if made, did not justify, in this case, the wife in voluntarily absenting herself for more than two years, because the record shows that this was not the reason she did so absent herself. They would not be a justification of the wife's desertion, because under the circumstances of this case they would not be a reasonable cause for desertion. *Farnham* v. *Farnham,* 73 Ill. 500; *Ward* v. *Ward,* 103 id. 477; *Angelo* v. *Angelo,* 81 id. 251; *DeMeli* v. *DeMeli,* 67 How. Pr. 20; *Kennedy* v. *Kennedy,* 73 N. Y. 369; *Mayhugh* v. *Mayhugh,* 46 B. Mon. 424; *Yale* v. *Yale,* 2 Stock. (N. J.) 138.

The wife's return after she had been defeated in her divorce suit not having been made in good faith, there was no condonation. *Kennedy* v. *Kennedy,* 87 Ill. 250.

CYRUS W. RICE, and LOUIS H. HANNA, for appellee:

To establish desertion three things must be shown: (1) cessation from cohabitation continuing the necessary time—two years; (2) the intention in the mind of the deserter not to resume cohabitation; (3) the absence of the other party's consent to the separation, or conduct justifying the same. 5 Am. & Eng. Ency. of Law, 799.

Ceasing to cohabit means ceasing to live together as husband and wife—ceasing to have a common home. It does not mean ceasing to have sexual intercourse. The question of support is not involved in the questions relating to desertion. *Fritz* v. *Fritz,* 138 Ill. 436.

If the party who left the other is looking forward to a renewal of cohabitation, or if there are pending treaties or negotiation for a renewal of cohabitation, there is no deser-

tion. A party who drives the other away is a deserter. *Lea v. Lea,* 99 Mass. 493. ·

The time,—two years,—does not begin to run until the intent to desert is formed. It does not run where separation is caused by the direction or consent of the party· claimed to have been deserted. *Fritz* v. *Fritz,* 138 Ill. 436.

If a husband, without just reason, charge his wife with a want of virtue and fidelity to her marriage vows, she is justified in living apart from him. *Farnham* v. *Farnham,* 73 Ill. 500.

A separation by the mutual consent of the parties is not desertion in either, although such consent may be revoked ' at any time by either. The consent need not be expressed; it may be inferred from conduct. If the husband orders the wife away without good cause, it is his duty to receive her back without the imposition of a single condition, if she has conducted herself in a proper manner while absent. *Gustafson* v. *Gustafson,* 66 Ill. App. 41; *Embree* v. *Embree,* 53 Ill. 394.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Appellant and appellee were married on September 12, 1889. They have two children,—Edward F. Lindsay, born October 28,. 1893, and Lawrence Lindsay, born April 17, 1897. Their home has been in the city of Chicago, appellant being a physician and having his office in his residence. On September 16, 1900, they had a quarrel at Macatawa Park, in Michigan, where appellee, with the two children, was spending the summer in a cottage rented by appellant. About a week after that trouble appellee went with the children to the home of her parents, in Monmouth, Illinois, and remained there until January 19, 1904. On April 23, 1903, she filed a bill for divorce in the circuit court of Warren county charging appellant with desertion and praying for a divorce and the custody of the children. The appellant an-

swered the bill, and there was a trial of the issue by jury. The verdict was not guilty, and the court, after overruling a motion for a new trial, dismissed the bill at the cost of appellee on November 4, 1903. That decree is in full force. On January 19, 1904, appellee returned to the home in Chicago and remained there in the same house with appellant until January 11, 1905. On January 12, 1905, she filed in the superior court of Cook county the original bill in this case charging appellant with extreme and repeated cruelty and praying for a divorce and the custody of the children. Appellant answered the bill denying the charges contained in it, and filed a cross-bill charging appellee with desertion for the statutory period and extreme and repeated cruelty, and prayed for a divorce and the custody of the children. Appellee answered the cross-bill denying the charges, and the issues formed under the original bill and cross-bill were heard by the court. A decree was entered dismissing the appellee's bill and appellant's cross-bill for want of equity, except as to the custody of the children. The court then proceeded to decree that appellee should have the custody of the younger child and the father should have the custody of the older child, in each case subject to the right of visitation by the other. Appellee did not appeal, but appellant removed the cause by appeal to the Appellate Court for the First District, and the branch of that court affirmed the decree.

Appellee assigned no-cross-errors in the Appellate Court or this court, and the decree is not questioned so far as the dismissal of the original bill is concerned. The only question is whether appellant was entitled to a divorce on his cross-bill.

The decree of the circuit court of Warren county on November 4, 1903, conclusively settled the fact that there had been no desertion of the appellee by the appellant for the statutory period, and that she had no ground for a divorce at that time. The decree was *res judicata* of everything

that was or might have been alleged by her as a ground for divorce, and the circumstances of the separation in September, 1900, are only material as affecting the rights of the appellant under his cross-bill. The circumstances of that difficulty and separation are as follows:

Appellee was spending the summer at Macatawa Park, Michigan, with her two children, and appellant visited them from time to time. Upon the occasion of one of these visits, on September 15, 1900, appellant, arriving at the cottage about noon, found there, eating dinner with appellee and the two children, a man whose personal intimacy with appellee appellant had previously made some objection to, although the families of the two men were on friendly and intimate terms, with the entire approval of appellant. Upon learning that this man had spent the night there with no one except appellee and the children appellant was very much excited. Appellee testified that he was very much agitated, sat down at the table, got up and went away, and sat down again and ate hardly any dinner. He took the children and went up-stairs, and after being with them about an hour he came down with them and said to appellee that he understood now why she had not come to Chicago three days before to spend their wedding anniversary together, as they had arranged to do. She testified that he then charged her with having committed adultery, while he testified that he did not believe such to be the fact or make the charge, but did charge her with being guilty of imprudent and indiscreet conduct and attempted to obtain an explanation. She testified that she made no reply whatever, and he went back up-stairs and after a while came down again and made the same charge. He testified that her reply was a counter-charge against him, and that she said she was not so certain he would not do the same thing if he had the opportunity, and that, in fact, she was not certain he had not already. Instead of seeking to conciliate him or make any explanation, or show that her conduct,

if indiscreet, was innocent of any wrong or wrong intention, she, according to her own account, was simply defiant and assumed that she had been wronged and abused, and from that day to this never attempted any reconciliation but demanded reparation for an assumed wrong. It is, of course, true that she was very angry at the time, and her conduct in making the counter-charge and refusing any explanation might be overlooked, but it was surely a time when she ought to have explained the situation and relieved appellant's mind from any suspicion that he might have entertained. At any rate, it was plainly her duty afterward to have made a full and fair explanation, and her persistence in assuming an air. of injured innocence and insisting that she had suffered wrong for which reparation ought to be made was not justifiable. She had been imprudent in violating well recognized rules established by society for the conduct of married people. Every man and woman must understand that they are to be governed by such rules and to make their conduct conform to established standards of propriety. Those standards are not made alone for the jealous and suspicious nor those who are so blind and deaf that they can see no ground for suspicion, but they do represent the deliberate judgment of the generality of people as to what is proper and the natural inferences to be drawn from certain lines of conduct. If her anger was an excuse for defending her conduct and that of her visitor, who must have known of the impropriety of his action, and making counter-charges against her husband, she was not justified in that course after her anger had cooled. At the end of the interview appellant gave appellee some money and told her to remain at the cottage so long as she saw fit and then return to her parents, and he left for Chicago. She stayed at the cottage about a week, waiting, as she testified, for a letter from appellant after his anger had ceased. She offered no explanation and wrote nothing to him, but his custom was to write letters to the little boys, who could

not read, with the understanding that she would read the letters. He wrote to one of the children and in the letter he asked appellee to return to Chicago, and she read the letter, as it was expected that she would. She testified that she did not act on the letter because it contained a renewal of the charge against her. It appears from her testimony that he did complain of her conduct, but it is quite clear that he did not make a charge of adultery against her. On receipt of that letter she telegraphed to her father to come to Macatawa Park, and her father, on his way through Chicago, stopped and saw the appellant, who said that he had made arrangements to have his family return to Chicago. She and her father and the children left Macatawa Park but did not stop in Chicago and went directly to Monmouth, and the appellee wrote the appellant a letter stating that she had arrived there. Appellee's counsel say that there was no desertion by appellee in going to Monmouth, because of the charges against her. It was said in *Farnham* v. *Farnham,* 73 Ill. 497 that if a husband continually and without just reason reproaches his wife for a want of virtue she is not required to submit to the degradation, and while that fact will constitute no ground for divorce it will justify her in living separate and apart from him. This is not the kind of a case contemplated in that decision. It is a case where appellee, by inviting a man whose personal association with her appellant had formerly objected to, to stay over night in the cottage where there were no other persons except the two small children, had been guilty of an imprudence which called for some explanation, even if appellant did make the charge against her as she states it. He testified that he did not make such a charge, and, at any rate, he continually and repeatedly informed her that he did not charge her with the offense and did not believe it.

During the absence of appellee at Monmouth appellant sought by every means in his power to have her return to her home and to have the difficulties laid aside. He sent

Mrs. A. M. Bowman, a neighbor and member of the same church to which he and appellee belonged, to Monmouth in 1900 to induce appellee to return, and he visited her at different times and had an interview with her at the Palmer House, in Chicago. She refused at all times to return, but would make some proposition that she might come back at some future time if he would comply with some conditions which do not very definitely appear. She testified that at the interview at the Palmer House he denied making the charge which she insists that he did make, and said that he did not believe she would do such a thing and no one could make him believe that she did. She testified that he wanted to bury the past with those denials, and she said, "Of course I would not consent." Her testimony was that she wanted him to do something to make her think he was acting in good faith and to grant her something or convince her in some way that "these things" would not occur again. Perhaps nothing will better illustrate her attitude than the following letter which she wrote after the appellant's visit to Monmouth to see if there could not be some basis found on which they could live together again:

"MONMOUTH, ILL., *July 17, 1902.*

"*Dear Clarence*—Your lawyer asked father upon what grounds we might again live together. As the only one I have to make is beyond the jurisdiction of the law I make it to you: Retributions of the wrong done to me as wife and mother to the children and to yourself. This would include acknowledgments to all those directly injured and manifestations of a return to better purposes indicated by a continuous support and protection of your family. If your heart does not prompt you to do this and more, then a legal separation is desired. Sincerely,

PEARL F. LINDSAY."

Her demands contained in this letter are somewhat difficult to understand. She required retribution, including acknowledgments to all those directly injured, and the only person directly concerned, beside herself, was her visitor at the cottage at Macatawa Park. She apparently intended that an acknowledgment should be made to him, and she

certainly demanded that the appellant should humiliate himself to her in some way.. She remained away for two years under those circumstances, refusing to return and showing no desire for a reconciliation, and never going farther than to intimate that she might come back at some future time upon conditions which she had no right to impose.

On January 19, 1904, appellee appeared at appellant's residence. In view of the recent divorce suit at Monmouth and what had occurred, he distrusted her motives and sought to ascertain what her intentions were. She testified that she replied that she had come back to make the best of the future, whatever it might be, and that she intended to do whatever the occasion might demand; that if he protected her in the right way it would be all right, but that if he did not and made it necessary she would defend herself. She established herself in the house and occupied a bed-room which she locked at night. A week or two before she came back, the same man who was the cause of the quarrel between appellant and appellee, acting for her, employed a detective to watch appellant for the purpose of obtaining evidence upon which to base a charge of adultery against him, and a lawyer who does not appear in the case in this court had also been employed to act for her, apparently by the same person. The appellee procured blank books, which are in the record, in which she wrote out at length everything that occurred having any bearing upon her right to obtain a divorce or for a legal separation from appellant with the custody of the children. Those books show her mental attitude to have been hostile to the appellant at all times, and every trifling thing which could be a cause of trouble was set down. She employed detectives through the attorney who was acting for her and paid them to watch her husband. In the appellant's absence she used the telephone in his office for the purpose of communicating with the detective and attorney, and the appellant, learning the fact, tapped the telephone so that he could hear some of

her conversations from the basement. During the time that she remained in the house quarrels were of almost daily occurrence and actual physical combats were frequent. It is beyond question that the appellee did not return with any intention of resuming marital relations in any manner, but apparently she had the view that by coming back to the house she would gain some advantage. She alleged in her bill that she had not lived nor cohabited with appellant as his wife since September 13, 1900, and while she was in the house after January 19, 1904, she did not resume marital relations in any manner, and appellant had a right to a divorce at that time on the ground of desertion. There was never any sort of condonation of the desertion. Perhaps neither of the parties can be justified in their conduct during the period after her return, but if there was no condonation of the desertion appellant did not forfeit his right to a divorce on the ground of desertion. The fact that they lived together under the same roof is no proof of condonation under the circumstances of the case, and the fact that she returned did not prove that the desertion did not continue. *Kennedy* v. *Kennedy*, 87 Ill. 250.

There are no errors of law to be corrected on another trial, and it is clear that no new evidence could be produced which would throw any light on the question to be decided. There have been two trials,—one before the jury in Warren county and the other before the chancellor in the superior court,—and there is no reason why the parties should be compelled to go through another trial for the purpose of putting the same facts into the record again. The facts are all before us, and it is both proper and necessary to the interests of the parties that their rights should be determined and litigation ended. Where it manifestly appears that the ends of justice would not be served by remanding the cause for another trial the result of which is certain, it is proper for this court to finally determine the controversy. The facts are fully ascertained and an application of the law

determines what the decree must be, which we will direct the superior court to enter, as was done in the case of *Stiles* v. *Stiles,* 167 Ill. 576.

The decree of the superior court so far as it dismisses the bill of the appellee is not in question and is final. In all other respects the decree of the superior court, and the judgment of the Appellate Court affirming the same, are reversed and the cause is remanded to the superior court, with directions to enter a decree granting to the complainant in the cross-bill an absolute divorce from the defendant in said cross-bill, and making such provision for the care and custody of the children as may appear to be just and equitable at the time of entering the decree.

*Reversed and remanded, with directions.*

HAND, WILKIN and CARTER, JJ., dissenting:

We are of the opinion the decree in this case should be affirmed. If, however, it is to be reversed, we think it should be remanded to the trial court for a new trial, where the appellee can have a trial before a jury if she so desires. *Osgood* v. *Skinner,* 186 Ill. 491; *Clarke* v. *Supreme Lodge Knights of Pythias,* 189 id. 639.

The question whether this court has the right to remand a cause in which a party is entitled to a jury trial, with directions, does not appear to have been raised, and that question is not discussed in the opinion filed in the case of *Stiles* v. *Stiles,* 167 Ill. 576, and while the question of the power of the Appellate Court, and not this court, to remand a case in which a party is entitled to a jury trial, with directions, was under discussion in the *Osgood* and *Clarke cases,* what was there said applies to all courts of review, and is applicable to this court as well as to the Appellate Court, and on principle we can see no difference between the power of this court and the Appellate Court in that regard.