## Leslie C. Hughes v. Grace B. Hughes.

### Gen. No. 13,258.

1. ADULTERY—*what not defense to charge of.*  A charge of extreme and repeated cruelty does not constitute a sufficient recriminatory defense to a charge of adultery.

2. ADULTERY—*what evidence sufficient to establish.*  Where it appears that the party charged with adultery maintained an attitude hostile to her husband, frequently telling him that she did not care for him, and maintained, against his protest, relations of intimacy with one for whom, by word and conduct, she appeared to entertain an affectionate regard, and was found in places where the opportunity to commit adultery was present, establishes, where accompanied by other facts and circumstances, the charge of adultery made against her.

3. VERDICT—*in chancery, when disturbed as against the evidence.*  Where the verdict of a jury rendered in a chancery cause appears to have been clearly against the weight of the evidence, the same will be set aside.

4. INSTRUCTION—*should not single out particular witness.*  An instruction is erroneous which singles out and calls undue attention to a particular witness.

5. INSTRUCTION—*when, upon credibility of witness, erroneous.*  An instruction is erroneous which permits the jury to disregard the testimony of a witness where he has been guilty of exaggeration.

6. INSTRUCTION—*must not assume existence of fact upon which there is no evidence.*  An instruction is erroneous which assumes the existence of a fact upon which there is no evidence.

7. WITNESS—*what fees may properly be paid nonresident.*  A nonresident witness who attends court may properly be paid his reasonable expenses in coming and going and for the time which he necessarily sojourned at the place where the case was tried.

8. DIVORCE—*when instruction as to animus of husband in bring-*

*ing action for, erroneous.* An instruction is erroneous which directs the jury's attention to an immaterial matter, namely, the animus of the husband in bringing the suit as seeking a property advantage or the possession of his children.

Divorce proceeding. Appeal from the Superior Court of Cook County; the Hon. WILLARD M. McEWEN, Judge, presiding. Heard in this court at the October term, 1906. Reversed and remanded. Opinion filed May 13, 1907.

PHELPS & CLELAND, for appellant.

ALLEN G. MILLS and FRANK C. COOK, for appellee.

MR. JUSTICE HOLDOM delivered the opinion of the court.

This is a cause matrimonial, in which both parties find the yoke which binds them irksome and galling and seek a divorce from each other under reciprocal charges of adultery. To her charge of adultery Mrs. Hughes adds one of extreme and repeated cruelty.

Before entering upon or discussing these recriminatory charges of adultery, we will dispose of Mrs. Hughes' accusation of extreme and repeated cruelty against her husband. It is firmly settled by the law of this State that a charge of extreme and repeated cruelty does not constitute a sufficient recriminatory defense to a charge of adultery.   Bast v. Bast, 82 Ill., 585; Stiles v. Stiles, 167 Ill., 576.

This being the law, we do not regard it as either expedient or necessary to enter into an examination of the evidence touching this charge, or to decide whether or not the proofs were sufficient to justify the jury in finding the husband guilty upon this charge, for in the ultimate decision of this appeal it is of no consequence.

The custody and nurture of the two children, the offspring of this marriage, are involved in this appeal, and it is of material importance to their welfare that they should be entrusted to the innocent party, and not to the one guilty of adultery.

The verdict of the jury exonerated both parties from the charge of adultery made by each against the other.   On the

verdict finding the husband guilty of the extreme and re-
peated cruelty charged, the court gave to the wife a decree
of divorce, the custody of the children, alimony, solicitor's
fees, and allowance for the support of the children, per-
mitting her to take the children out of the jurisdiction of the
court and maintain them temporarily at Ann Arbor, Michi-
gan, reserving certain privileges of visitation and temporary
custody of them to the husband, and retaining jurisdiction
for the purpose of changing the order as to the custody of the
children and allowances for support and alimony. To re-
verse such decree this review of the record is sought. We
will first dispose of the charge of adultery made by appellee
against appellant.

The family of Clara Beifeld, with whom appellant is
claimed by his wife to have been intimate, consisted of her-
self, her father, two sisters and one brother. They lived at
939 Ridgeway avenue, in a flat. The brother's name was
Hagan; one sister, single, named Josephine, and the other
sister, married and detached from her husband, named Saun-
ders, who is the family housekeeper. In this family appel-
lant, after separating from his wife, took his evening meal
on secular days and dinner and supper on Sundays. De-
tectives were set to watch his movements, but their testimony
is barren of incriminatory acts. They saw him go into the
Beifeld flat building in the evening, and on several occasions
they left their spying without noticing appellant's exit. Ap-
pellee says her husband took Clara Beifeld out riding, and
that he once told her that he took Clara Beifeld to Ed Smith's
roadhouse, that he had the finest steak he ever tasted, and
that it cost $2.75 a plate. Otto Goersuch testified that on
September 3, 1905, appellant, on board the Eastland during
its voyage from Chicago to South Haven, introduced him to
a young lady as he was passing them on the boat, and that
he saw no more of them. The boat incident appellant denies.
No adulterous inferences from this casual incident, if true,
can be indulged.

As to Clara Beifeld she emphatically and positively denies
any intimate or adulterous relations with appellant at any

Hughes v. Hughes.

time.   Appellant himself makes a like positive denial.   Hagan Beifeld, the brother of Clara, corroborates appellant in relation to his visits to the Beifeld home, taking his meals there, and says further that appellant often lingered and played cards with the various members of the family until as late sometimes as ten o'clock at night.   That all such games were played in the presence of the family, and that appellant never stayed at the house over night.

While it has been said that a court will not presume that a man who visits a house of ill fame did so for the purpose of engaging in religious devotions, but that a strong inference of carnal acts on his part will, unexplained, be assumed to have followed upon such visit; so it may with equal propriety be assumed that when a man goes into the dwelling place of a respectable family at meal times and there continues for a reasonable space of time, that he partook of the meal served at the family table, and not do violence to all logic and decency by holding that adultery with a maiden, against whose reputation for chastity there is neither evidence nor suspicion, was upon such an occasion committed. Without any denial, such an inference would be wholly unwarranted.   But there is no room for inferences in relation to this charge.   There is no proof of it; and the evidence in denial is consistent, overwhelming and convincing.   We unhesitatingly concur in the verdict of the jury that Leslie C. Hughes is not guilty of the adultery charged against him by his wife in her cross-bill, and that such charges are baseless, and Clara Beifeld innocent of any sexual indiscretion with appellant.

Having disposed of all the charges against the husband, there remains for our consideration and determination the guilt or innocence of the wife of the adultery charged against her.   Unhappiness seems to have sat upon the threshold of the married life of the Hughes, for three days after their wedding the wife forsook the nuptial couch for the home of her mother, and did not resume the marital relation until five weeks thereafter.   Between the ringing of the marriage bells and the final separation in 1904 this mismated couple

were separated fifteen times. Two children were born of this unhappy union, a son and daughter, Vivian and Everel, who were thirteen and eight years of age respectively at the time of the trial, both of whom are said to be with their mother.

While Mrs. Hughes was erratic in her domestic habit of living with her husband, yet no moral lapses smirch her wifely character until the blighting immoral influence of the co-respondent, Septimus E. Gauthier, crossed her path in the summer of 1903. The Gauthier and the Hughes families lived within one block of each other, and became on very good terms, visiting in each other's homes frequently.

The first occult evidence of an improper attachment between Mrs. Hughes and Gauthier developed in July, 1904, on a trip to Toledo, where Mrs. Gauthier was visiting. The parties visited besides Toledo, Grand Rapids and Detroit, Michigan. Mrs. Hughes exhibited on the journey a marked preference for the society of Gauthier, which he seemed to reciprocate in full measure. They were constantly together, seeking each other's society and avoiding that of her husband and Mrs. Gauthier. At meals, in the cars, at the theaters, they were side by side. Appellant expostulated with his wife on her unmatronly conduct with Gauthier, and she thereupon retorted that she did not want to go home, that she did not care anything for her husband, that she was tired of him, and that she would go with Gauthier if she wanted to and he could not prevent her from so doing, whether he liked it or not. The parties reached their home about August 1, 1904, and she next left her husband the twenty-first day of the same month. During these three weeks she was constantly seen with Gauthier. Two days afterwards Hughes saw his wife and Gauthier together on Adams street in the vicinity of Wabash avenue. He talked with both of them at that time, and asked his wife to go home, and objected to her going with Gauthier. She refused and again informed him she was tired of him; that she would go with Gauthier all she desired, that it was none of his business, and that no law could compel her to live with him if she did

not want to.    She returned to her home August 24, leaving again on August 30, and remaining absent from her home until November 26.    Upon leaving August 30 she told her husband she would not remain in his home if she could not have Gauthier's company there.    She once more departed, January 4, 1904, writing a letter in which occurs the following: "Les: I am going away. I may be doing a foolish or wicked thing, but I am thoroughly convinced you are nothing to me.    *    *    *"    She returned to her home once more, February 28, 1905, remaining until July 20 following, since which time she has not returned to her husband.    He thereupon, on October 3, 1905, filed his bill for a divorce, alleging her adultery with Gauthier.

Having observed the absence of Mrs. Hughes from her husband, we will now see what the record discloses were her actions with Gauthier during these absences.

An occurrence fruitful of incriminatory evidence of the adultery of Mrs. Hughes and Gauthier is the contents of the trunk of Mrs. Hughes, which her husband secured at the Northwestern railroad baggage rooms January 5, 1905.    He opened the trunk in the presence of the witness Coleman, and this is what their testimony shows they, among other things, found: About six photographs of Gauthier, two brushes upon which were Gauthier's initials, a plated padlock containing several convention badges of Gauthier, on which was engraved "Love laughs at locks," towels marked "Cecil," "Brunswick," "Plaza," "Brevourt" and "Revere," formerly the property of the hotels bearing these names in Chicago, and one marked "Pilgrim Hotel," of Marshalltown, Iowa.    Out of the pocket of Mrs. Hughes' seal skin coat, which was in the trunk, he drew a chain and locket.    In the locket was Gauthier's photograph, and on the outside of it was engraved an intertwining monogram composed of the letters "G. B. G.," which it is admitted were intended for "Grace Burgess Gauthier," Grace Burgess being the maiden name of Mrs. Hughes.

On Sunday afternoon, July 15, 1905, about two o'clock, Mr. Hughes saw his wife in the company of Gauthier on the

third floor of the Rensu Hotel in Wabash avenue south of
Van Buren street. This discovery was made with the aid
of Vernet Marsello, a detective who was a witness upon the
trial. Hughes swore out warrants for the arrest of both of
them, although he only had it served on Gauthier, who was
lodged in a cell at the Harrison street police station, and
Mrs. Hughes appeared later and bailed him out.

On two occasions, January 27, 1905, and February 2,
1905, Mrs. Hughes and Gauthier for two days and five days
respectively lived at the Wilson Hotel, Mason City, Iowa,
and during all of their stay occupied the same room. This
is abundantly established by the testimony of the hotel clerk
and the hotel register.

In February, 1905, Mrs. Hughes admits she stopped at
the Pilgrim Hotel, Marshalltown, Iowa, but claims to have
registered as "Mrs. J. Brooks," and to also have registered at
various other hotels under assumed names. She also admits,
that after traveling around to various places she went to
Ann Arbor in August, 1905, and kept boarders, among whom
was Gauthier. She admits borrowing money from Gauthier,
also the present of the locket with his picture in it, and the
meaning of the monogram on it. Mrs. Hughes also admits
that her husband expostulated about her relations and evi-
dent intimacy with Gauthier, and confesses that she did not
heed his admonitions or change her course with Gauthier.

In July, August and September, 1904, Mrs. Hughes and
Gauthier were seen by Mrs. Cora G. Duffy at the rooming
house, 575 West Madison street, three or four times, and on
these occasions they occupied the same room.

Irving Hasner, the landlord of the "Hotel Rensu," testi-
fies that Gauthier and Mrs. Hughes occupied the same room
in his hotel on the afternoon of Sunday, July 15, when
Hughes called with the detective and made the arrest of
Gauthier; that he went to the room and informed Mrs.
Hughes that a man claiming to be her husband was at the
office with another man. She opened the door. Gauthier
had some of his clothes off, and she her hat. That Mrs.
Hughes said she thought it quite likely it was her husband,

and seemed much disturbed and alarmed.    She urged Hasner to let her escape by a side entrance, and he did so by allowing a bell boy to escort her out that way.

The whole of this evidence is irreconcilable with Mrs. Hughes' innocence of wrongdoing with Gauthier.   Her excuses are lame and impotent in accounting for her conduct on the theory of her innocence.   Her explanations utterly fail to satisfactorily explain her relations with Gauthier or to exculpate her from the only rational interpretation to which her actions are susceptible, viz.: adultery oft and continually repeated with Gauthier.

Her attitude of hostility to her husband, her frequently telling him she did not care for him, her refusal to abstain from consorting with Gauthier, her manifest preference for Gauthier, both by word and action, repel all her protestations of innocence.   Her possession of many photographs of Gauthier, the padlock containing his convention badges and marked with the motto, "Love laughs at locks," are incriminating circumstances of the most convincing character.   The locket with Gauthier's picture, engraved with the initials of their names, is, with the record of their continually consorting together, convincing proof that wifely virtue had been forsaken for illicit love.   The intertwining of the initials of those of the opposite sexes on keepsakes has been an emblem of love's pledge time out of mind.   All these acts and tokens of love between Mrs. Hughes and her paramour are harmonized by her admission that in another State, Gauthier, her lover, is an inmate of her home.   To believe otherwise, from such a convincing array of facts and circumstances, than that Mrs. Hughes has been guilty of adultery with Gauthier, would strain our credulity to the limit.   When Hughes caused the arrest of Gauthier at the "Rensu Hotel," his wife was swift at the earliest opportunity to go to her paramour's assistance and release him from his prison cell.   Her attempt to prove an alibi on this occasion is weak and self-refuting.

We search this record in vain for any explicit denial on her part of adultery with Gauthier, and if she is innocent

why did she not produce Gauthier as a witness to repel her husband's attacks upon her virtue? The conclusion is irresistible from all the evidence that she has dishonored her wifehood and that Gauthier is her guilty paramour. What did she mean when she said in the letter she left on her departure, "I am going away. I may be doing a foolish or wicked thing"? What was the foolish or wicked thing she had in mind, if not her past and her contemplated future adulteries with Gauthier? Paraphrasing the words of the Supreme Court in Stiles v. Stiles, *supra:* Her innocence was assailed, but Gauthier sat silent at the trial under the imputation and suffered her to bear the burden of explaining the occurrences as best she could.

We are satisfied that the verdict finding Mrs. Hughes not guilty of the adultery charged against her in the original bill is so manifestly against the weight of the evidence that it is our duty to reverse the decree of the trial court. Belden v. Innis, 84 Ill., 78.

There is a strong suspicion arising from the evidence in this record that the verdict of the jury was influenced by passion and prejudice. Lowenthal v. Strong, 90 Ill., 74.

Even where the evidence is conflicting on vital points, and the verdict depends upon the credibility of the witnesses, and consequently the finding of the jury is entitled to great weight in the reviewing court, still, if such reviewing court is not, upon careful consideration, satisfied with the conclusion reached by the jury, a new trial will be awarded. Hayward v. People, 96 Ill., 492.

We do not regard the evidence on the vital points in the case at bar, in support of the charges of adultery against Mrs. Hughes, as being in conflict.

The remarks of the court complained about are not subject to the objection made. The court had to rule on the objection. The ruling might have been couched more adroitly, but we are unable to say that the court's language had any misleading effect upon the jury. It certainly was not material to the issues what price the husband paid for the seal skin sacque and the diamonds he bought his wife. No cruelty

Hughes v. Hughes.

could be well assigned on his failure to buy either, no matter how much she might importune him to supply them to her.

In this case it was of the essence of a fair trial that the jury be instructed accurately upon the law, so that they might not be misled in its proper application to the facts in evidence.    There are several instances where the instructions were inaccurate and harmful.

The fourth instruction inferentially calls undue attention to the witness Gibson, who traveled from Mason City, Iowa, to Chicago, to attend court as a necessary witness, which his evidence ultimately showed him to be.    He was entitled to his reasonable expenses in coming and returning, and for the time he necessarily sojourned here.    This instruction told the jury that the fact of a witness being paid for attending court was a circumstance to be taken into account in judging of his credibility.    This was error, in omitting a qualifying phrase telling the jury that payment should be limited to a reasonable compensatory charge for a non-resident witness. All witnesses are entitled to fees under our statutes.    The instruction was faulty in giving undue prominence to the witness Gibson, as in the state of the evidence it could only be understood as referring to him.    It is amenable to the criticism made in Donoghue v. Egan, 85 Ill. App., 20.

We think the fifth instruction without warrant of law, in that it tended to direct the jury's attention to an immaterial matter, viz.: the animus of the husband in bringing the suit as seeking a property advantage or the possession of his children, both of which would be controlled by the decision on the charge of adultery.    Animus was not a factor to the finding of the jury, and had no effect whatever upon the real question of whether or not the wife was an adulteress.

The sixth instruction was equally erroneous, and squarely falls within the condemnation of Chicago City Ry. Co. v. Allen, 169 Ill., 286, and C. & S. L. R. R. v. Kline, 220 Ill., 334.    The court say in Chicago City Ry. Co. v. Allen, *supra:* "It is not the law the entire testimony of a witness may be rejected from consideration by the jury upon the

ground the witness had wilfully exaggerated any fact or circumstance, but only when he has wilfully and knowingly sworn falsely to some matter or thing material in its character. 29 Am. & Eng. Ency. of Law, p. 780, and citations in note 1." The court said in C. & St. L. R. R. Co. v. Kline, *supra,* that "the doctrine *falsus in uno, falsus in omnibus,* is only applied as a rule of law to a witness who has knowingly or wilfully sworn falsely as to some fact material to the issue."

We think the ninth instruction as applied to the evidence was calculated to mislead the jury, as there is nothing in the evidence justifying an assumption that appellant had either the inclination or opportunity to commit adultery.

Instruction ten states an abstract proposition of law, which lent neither light nor aid to the jury by which to solve the question, and instruction eleven is grossly misleading in assuming a fact about which there is no evidence, viz.: that Hughes forgave his wife whatever she may have done prior to February 28, 1905, from which fact the law adjudges condonation which would bar Hughes from obtaining a decree of divorce.

Other errors are assigned and argued, but we do not deem it necessary to pass upon them in our decision of this appeal.

For the errors indicated the decree of divorce and all its orders, awarding the custody of the children to Mrs. Hughes, the payment of alimony, suit money and support of the children, is reversed, and the cause remanded for a new trial conformable to this opinion.

*Reversed and remanded.*