Thomas J. Grady, Appellant, v. Eileen Grady, Appellee.

Gen. No. 35,071.

O'CONNOR, P. J., specially concurring.
MCSURELY, J., dissenting.

Opinion filed December 28, 1931. Rehearing denied January 15, 1932.

EDWIN HAMILTON, for appellant.

CRAHEN, SULLIVAN, O'TOOLE & SULLIVAN, for appellee; JOHN E. CRAHEN, of counsel.

MR. JUSTICE MATCHETT delivered the opinion of the court.

On June 21, 1929, Thomas J. Grady filed his bill of complaint against his wife, Eileen Grady, praying for a divorce on the ground that she had deserted him on September 4, 1924. On July 18 thereafter she answered, admitting the marriage as averred on June 30, 1923; denying that the complainant had treated her kindly as he alleged in his bill; denying that she deserted him without reasonable cause, but asserting, on the contrary, that she was driven from his home by repeated cruelties, and that he had deserted her.

On August 12, 1929, defendant filed a cross-bill alleging that she had always been a dutiful wife; that she lived with complainant until September 4, 1924, when she was forced to leave him because of his repeated cruelties; that on September 3, 1924, he beat, choked and struck her, and that on the following day he struck, beat and drove her from their home with a revolver, at the same time threatening to take her life. She alleged that he was worth about $500,000, but that he was turning all his property into cash with the intention of leaving the jurisdiction of the court. She prayed for a divorce and for support, maintenance, temporary alimony and solicitor's fees.

On October 1, there was a substitution of solicitors for complainant, and on the same day an amended and supplemental bill was filed in which complainant, among other things, alleged that defendant married complainant only for the purpose of getting alimony and charged 17 specific acts of adultery with four different men between May 11, 1926, and July 31, 1930. The amended and supplemental bill, like the original, prayed for a divorce.

On October 14, defendant answered, denying specifically and in detail each one of the acts of adultery as alleged, and on the following day she filed an amended cross-bill in which she alleged that while living with complainant she had suffered a miscarriage as a result of his cruelties; that he had refused to furnish her with necessary medical attention; that two days after her marriage she had turned over to defendant $2,400 in cash, no part of which had been returned to her; that through false representations complainant had secured her signature to a number of warranty or quit-claim deeds. The amended cross-bill particularly describes the real estate, the title to which, it was alleged, had been thus obtained.

Complainant answered, denying all these charges. The cause was put at issue and the testimony heard by the chancellor in open court, and a decree was entered January 24, 1931, which finds that the parties were married June 30, 1923, at Chicago; that they lived together until September 4, 1924, and that no children were born of the marriage. The decree further finds that Eileen Grady "is not guilty of any or either of the acts of adultery set forth in the complainant's amended and supplemental bill"; that she is not guilty of desertion; that complainant has failed to establish "any or either of the charges alleged" and "is not entitled to any relief prayed for in said bill." The decree orders the amended and supplemental bill dismissed for want of equity.

The decree further finds that the parties lived together until September 4, 1924, when "owing to the cruel and inhuman treatment of the said Thomas J. Grady, it was necessary for said cross complainant, Eileen Grady, to cease living with him as his wife." It specifically finds that on September 25, 1923, complainant struck his wife, leaving bruises and discolorations upon her body; that on October 16 and Octo-

ber 24, 1923, he struck her violent blows upon the head and body, leaving black and blue marks thereon; that on February 24, 1924, he struck and beat her, by reason of which she suffered a miscarriage; that on September 3, 1924, he attempted to take her life by the use of a butcher knife, and on September 4, 1924, "drove cross complainant, Eileen Grady, from her home with a certain revolver and threatened the life of said Eileen Grady and informed said Eileen Grady that if she returned to said home on said date he would kill her." There were further findings to the effect that Eileen Grady had established the material allegations of her cross-bill as to both cruelty and desertion.

The decree, however, further finds that on July 9, 1930, Mrs. Grady went to Bluff Lake, Illinois, with one Robert J. Robinson; that Robinson rented a cottage on the lake and that Eileen Grady and Robinson were there introduced to John and Genevieve Lucas as Mr. and Mrs. Robinson; that Eileen Grady wrote three love letters to Robinson on July 16, 17 and 21, 1930; that Eileen Grady was riding around alone in an automobile with Robinson; that on July 31, 1930, she was with Robinson at Bluff Lake; that she was alone with him in the cottage rented by him on July 31, 1930, after dark; that she was a married woman and he a married man, and that her conduct "was not the conduct that was justifiable under any circumstances"; that everything on the night of July 31, 1930, was a frameup and that if Eileen Grady is guilty of adultery the whole thing was framed beforehand and that defendant is therefore entitled to no relief, and that Eileen Grady is not guilty of adultery, neither is she guiltless, in that she was carrying on an intrigue and flirtation with a married man and that her conduct was such as to prevent her from obtaining any relief.

The decree further finds that on July 23, 1923, Eileen Grady turned over $2,400 in cash, which was her own property, to her husband; that she is entitled to have

the same returned to her with interest to date; that Eileen Grady was living in a house which she claimed belonged to complainant, but that the building was claimed to be owned by one Peter Maguire; that if the property is still owned by complainant, she should be entitled to remain there—we presume as her homestead—but that if it belongs to Peter Maguire, he is entitled to his property; that Eileen Grady is not entitled to alimony and solicitor's fees; that the question of the ownership of said building should be referred to a master in chancery to determine its ownership; that the amended and supplemental bill of complaint should be dismissed for want of equity; that Eileen Grady should have no relief except as to the $2,400 given to complainant, and except as to the building at 6334 Francisco avenue, in which she was living, and as to the ownership of that property the cause was referred to a master in chancery to take the testimony and report.

The decree further directs that Eileen Grady have and recover from complainant the sum of $2,400 with interest at five per cent from July 1, 1923, to the date of entry of the decree, and that in the event of failure of complainant to pay said amount within five days from the entry of the decree, upon filing an affidavit of such failure, execution issue therefor. The decree also finds that complainant is indebted to Eileen Grady in the sum of $235 which accrued prior to the filing of complainant's amended bill for divorce on October 1, 1930, and orders said sum to be paid within 20 days and reserves jurisdiction to enforce such payment. It orders that complainant should not be required to pay to Eileen Grady any further solicitor's fees other than the amount formerly allowed on August 13, 1929, viz., the sum of $250 which had been theretofore paid; that complainant should not be required to pay any court costs and expenses incurred by Eileen Grady; that

her bill for divorce filed on October 15, 1930, should be dismissed for want of equity.

From this decree complainant has perfected this appeal and defendant has assigned cross errors. Elaborate briefs have been filed and the cause argued orally. The appeal has received unusual attention because of divergent views entertained by the judges of this court with reference to the facts and the law applicable thereto.

Upon some matters, however, we are in substantial agreement. We are agreed that the husband was guilty of the acts of extreme and repeated cruelty and of the desertion as alleged in the cross-bill and found by the decree, and that the charges of adultery other than with one Robert J. Robinson are not sustained by the evidence produced. We are agreed that defendant's conduct with Robinson was highly improper, and a majority of the court—the writer not concurring—are of the opinion that the evidence must be held to establish the charge of adultery with him. A majority of the court—the writer concurring—are further of the opinion that the conduct of complainant was such as to preclude him from obtaining a divorce from defendant on that ground.

A review of the stormy marital career of these parties seems necessary. As already stated, the parties were married June 30, 1923, at Chicago. She was then about 29 years of age and he perhaps a year older. He had studied law, was a graduate of Northwestern Law School, but was extensively engaged in the real estate business.

For a few days after the marriage Mrs. Grady lived at the home of a sister of her husband, Mrs. Regan, while he continued to reside at his former home. He owned a ranch at Colorado Springs, Colorado, and within a week after their marriage they went there by automobile. About the first of September they re-

turned to Chicago. At first they rented a furnished apartment but after about a week returned, as Mrs. Grady testified, to the home of the Regans. On October 25, they went to live at 714 Barry avenue and they continued to reside there until February, 1924. In January of that year Mr. Grady took a trip to Hot Springs. He says he had a nervous breakdown; he was away for about four weeks; his wife did not go with him; she says she was not invited. They returned to Colorado Springs about March 1 and remained there until the end of April, when they returned to Chicago and took an apartment at 6224 Mozart street. It was a three-apartment building owned by Mr. Grady's friend, Michael Kelly, whose family lived in another apartment in the building. It was while living there and, as both agree, on September 4, 1924, that the separation took place.

After the separation Mrs. Grady at first went to the home of Mrs. Regan and remained there about six weeks and later Mrs. Regan assisted her in moving to the second flat in the three-apartment building owned by Mr. Grady at 6334 Francisco avenue. The record does not indicate that the parties met again until June, 1925. At that time Grady was at Battle Creek, Michigan, ill and preparing for two operations. Without his request she visited him there. He says that when he first saw her there she was waiting in his room and that he was surprised to see her; that she remained in the room only about 15 minutes; that she tried to get him to execute a will, which he refused to do; that he called up and found out that the train for Chicago would leave between one and two o'clock that night and that he then arranged for a room for her; she says that they stayed together in that room that night and until four o'clock the following afternoon when she returned to Chicago. She says that when he returned to Chicago he made an appointment to meet

her and that she met him at the corner of Devon and Francisco avenues; that they talked about the past and about planning a trip to Europe; that he told her they would not at that time live together but would do so after his return. While at first denying this meeting, on cross-examination he admitted that he met her at Francisco and Devon. He says that he asked her to come back, that he "still had a lot of regard for her then," and that this was the last time he talked to her until he returned from Europe, when he again asked her to return and live with him, which she refused to do. While apparently not talking with or again meeting her, he sent to her $100 each month and continued to do so up to the time of the filing of the bill. The true state of his mind at this time is disclosed by a letter he apparently wrote July 3, 1925, but which was mailed to her at Battle Creek, Michigan, on August 20, 1925. It read:

"Eileen: I am keeping my promise to write to you at this time; I am not able to write much. I have had two operations and only just up four days ago, but am still sick and will be for some time. I went through a good deal as I was so sleepless. I was thirteen days in bed and had to take opiates to sleep, but then that suffering was nothing to other suffering of the mind.

"I do not worry about the operations any more, for these are minor things in life now. In about a week I will undergo another which is the most serious, and if I am well after that it won't be so bad.

"I can't add anything to what I said when you were here as I am too sick to think of things. The past has been too much for even me. No ship could weather all storms and as the sun is set, what matter if the moon loses its light as well? I want to be alone. I have neither friends nor enemies.

"It is as I wish it, and I don't want to see anyone. I knew before that I have to forget as far as possible all the past. If I am to be able to stand it—I weigh 137

pounds now; I weighed 183 pounds once, so there isn't much left, but I will be all right.

"Take care of yourself.

(Signed)    Tom."

Another letter from him to her written about this time, is as follows:

"Eileen: Before I was operated on I promised I would write you after I was over my operation and would have immediately in accordance with my promise, but before I could do so you had resorted to the indiscreet route by telegraphing to the sanitarium.

"That was typical of you, and although it hurts me somewhat, the effect was not as serious as it once was. Thank the Gods for that.

"I am not able to write much more or say much yet, but one thing is certain, that I have suffered the worst and still I am—although I realize that is all over for I never can be myself physically or mentally.

"I will not go into the details or bother you with them, knowing that you are better off without details and it will not take up much of your time reading it, but the physical suffering has not been anything like one night of mental suffering. However, this too, shall pass away, and everything shall some day be forgotten.

"I am a little better although not much. I have passed—I shall see you when I get back. Hope you are well, and shall always wish you health."

In March, 1926, Mrs. Grady became acquainted with Marie Van Ornum, who more or less of the time thereafter up to June 6, 1930, lived with her in the Francisco avenue apartment. On this last named date Miss Van Ornum went to Crystal Falls, Michigan, for a visit. While living with Mrs. Grady, Miss Van Ornum made the acquaintance of Robinson in April, 1930, and three days later she introduced him to Mrs. Grady. From that time until she left for Michigan, Miss Van

Ornum met Robinson two or three times a week, and she says they "were keeping company with each other." The record is quite barren of facts which we would wish to know with reference to Robinson. It appears, however, that he was married at this time and had two grown daughters, one of whom was ill. He testified in this case, and it appears that about a week prior to the giving of his testimony his wife had obtained a divorce from him upon grounds not disclosed. He had a position with the telephone company. The telephone at Mrs. Grady's home had become out of repair and it was while repairing this telephone that he first met Marie Van Ornum. During the time he was paying attention to Miss Van Ornum he, by Mrs. Grady's invitation, twice took meals at her home, Miss Van Ornum being present.

Miss Van Ornum, testifying for complainant, states that she had never seen anything improper in Mrs. Grady's conduct, and a number of Mrs. Grady's neighbors testified to her previous good reputation. Upon her return from Crystal Falls Miss Van Ornum talked over the telephone with Mrs. Grady, from whom she had received messages while away. She asked Mrs. Grady about staying at her home again, but Mrs. Grady replied that she would be leaving the city soon to go to Syracuse, New York. Miss Van Ornum says, "She did not even invite me to her home," and after she returned to the city she (Van Ornum) did not again hear from Robinson. In the meantime another lady, Miss Molly Verdon, had taken the place of Marie Van Ornum in Mrs. Grady's home.

The exact date upon which Robinson became interested in Mrs. Grady is not disclosed, but it is not disputed that on July 9, 1930, Mrs. Grady went with Robinson to Bluff Lake, Illinois. The testimony of the owner of the cottage and of his wife is to the effect that Mrs. Grady and Robinson looked a cottage over

together there; that it was stated that the cottage was wanted for a daughter who was sick and the doctor had advised country air, and that later in the afternoon they came back together and Robinson said he would take the cottage. The owner and his wife testify that at that time Robinson introduced Mrs. Grady as his wife, and that in going up the hill from their place, Robinson put his arm around Mrs. Grady; that they were leaning their heads on each other's shoulders and kissing each other. This testimony is denied by Mrs. Grady and by Robinson.

On July 12, 1930, Mrs. Grady left Chicago for Koontz Lake, Indiana, where she remained until July 24. While there she wrote Robinson on July 15 as follows:

"Chicago, Tuesday

"Dear Bob:

"Received your letter this morning; very glad to hear from you; it was too bad you had to wait back a day in taking the folks to Bluff Lake, but it was wiser to wait as it was quite cold Sunday and Monday. So far I have enjoyed every minute here. Saturday we left Chicago at one; we had a lovely chicken dinner on the road; the ride was fine, only it was very hot.

"We got here about six; then we shopped for Sunday and we managed to have a swim before dark.

"Sunday was very cold; in order to keep warm we played horse-shoe, jumped rope, climbed trees, played cards, and Ethel and myself were brave enough to go in swimming, but the water was lovely. I only wish you were here, you would say, as you always say, 'This is fine.'

"I guess I have told you all. I miss you very much, I won't tell you how much, I will save that part till I get back. Be sure to save those D. F. K. for me until we meet again.

Corkie."

July 16, she wrote:

"Kuntz Lake,
Wednesday.

"Dear Bob:

"The letter which I wrote you yesterday must be funny, as the whole bunch was talking around here as I wrote it. Today I decided I would write you a few lines on this Irish paper, just to prove to you that I think of you all the time. We just got home from swimming. The water was swell. I have learned quite a few stunts, as swimming under the water and turning over under the water. I shall be a good swimmer when I return. Have you taken the folks to the lake yet? Bob, it is perfectly lovely here. I am enjoying every minute. I only wish you were here; we would have some grand times. Ethel and I are well mated; she likes everything that I like; even the cold days we went swimming, and the others sat around here like your friend Miller. It is hard for me to write or even think, as there is someone around all the time. Be a good boy until I see you, and don't do anything I wouldn't do. With Eileen."

July 19, she wrote him:

"Saturday, July 19.

"To begin with, I must thank you for the package which I received yesterday. Bob that certainly was beyond my expectations. No words could ever express how thrilled I was when I got that package. Ethel and Mr. Oberg were with me at the time. They kidded me, but I did not make them any the wiser. Bob, many the times I have wished you were here. We are having one grand time, but I am counting the days until I see you. Yesterday we were surprised with company from Chicago. They are staying over Sunday. They are friends of Ethel's. The swimming here is great. I have learned to be brave. Bob, I only wish you will enjoy Bluff Lake as well as I enjoy Kuntz Lake. I

have not heard from Mollie. I wonder if everything is all right at my house. Bob, I am wondering if you get my letters. It is hard to write here as everyone is talking. I suppose you are at Lake Bluff by now, but I am taking a chance on sending this. Again thanking you for my pleasant surprise.

Eileen.

"P. S. Be a good boy until I see you, and enjoy yourself, and don't do anything that I wouldn't do. I feel like sending you a few crosses on paper, but will save them 'til we meet again."

Mrs. Grady reluctantly admitted on cross-examination that the letters "D. F. K." meant "damn fine kisses." However, her reference in two of the letters to his taking his folks to Bluff Lake indicates that she did not understand the cottage was being rented for the use of herself and Robinson.

Mrs. Grady says that Robinson told her he had been divorced, and she explains that "Corkie" was a pet name she used because she was born in County Cork. She says that upon her return she did not see Robinson between July 24 and July 31. The events of that particular date will be discussed later.

A review of this record is rendered exceedingly difficult not alone by the size of it and the numerous incidents concerning which conflicting evidence is given, but also by reason of the fact that each of the parties seems to have been willing to accept untrue testimony. Grady at his real estate office and at other places seems to have been usually attended by Bernard Shanley, who received compensation to the amount of $500 a month and whose principal services during this time seems to have been directed to obtaining evidence against Mrs. Grady. There is in the record a long letter from Shanley to Robinson under date of August 12, which clearly indicates his desire to obtain evidence against Mrs. Grady and (we have already pointed out) his willingness to fabricate it if necessary.

In the background of this entire legal struggle appears the admitted wealth of Grady, and a perusal of the record leaves little doubt that this stimulated the interest and activity of the friends of the parties. Marie Van Ornum denied on cross-examination that she told Mrs. Grady's attorneys that Michael Kelly would make it worth her while to go on Grady's side and had left a $20 bill with her which she afterwards returned. Mrs. Grady testifies that Marie so stated. Kelly did not testify.

We have already indicated in this case our approval of the findings of the decree with reference to matters other than that of the relations of Mrs. Grady with Robinson. In view of the nature of the testimony given by complainant Shanley and other witnesses, in sustaining that finding we must assume their willingness to give false testimony and their alacrity to fabricate it. These facts render it quite impossible for this court to hold that certain things which Shanley and Grady say occurred at Highland Park, in the forest preserve, and on two occasions prior to July 31 at night in the cottage at Bluff Lake are true. Not only is the testimony as narrated inherently improbable and contradicted by the testimony of Mrs. Grady and Robinson, but as to improper conduct said to have taken place in the cottage on June 26, the testimony of these two is corroborated by that of the street car conductor upon whose train on that day Mrs. Grady received a slight injury for which a few days thereafter she was paid compensation by the street railway company.

This leaves for consideration the most serious accusation which concerns the admitted presence of Mrs. Grady and Robinson at the Bluff Lake cottage on July 31. The finding of the decree is to the effect that Mrs. Grady was there alone with Robinson at this time after dark; that her conduct was not justifiable under any circumstances; "that everything on the night of July 31, 1930, was a frameup and that if defendant

and cross complainant, Eileen Grady, was guilty of adultery, the whole thing was framed beforehand and that therefore the complainant, Thomas J. Grady, is entitled to no relief." We would wish that the findings of the chancellor had been more specific as to the facts constituting this "frameup."

The evidence in the record shows that Mrs. Grady and Robinson were in the cottage on that evening; that about 12 o'clock that day Robinson called her up and said that he had seen an article in "The American" about lotus lilies that grew in Grass Lake; that he asked her if she would drive out and see these lilies and also inviting Mollie Verdon to go with them. She says she told him that Mollie was downtown and would not be home. He then asked her if she wanted to go and she said "All right." They left Chicago about three o'clock in the afternoon, Robinson meeting her at her home; they then drove to Bluff Lake, arriving there about a quarter after five. She says that Robinson said he would like to turn over to the owner the keys of the cottage; that Grass Lake was only a short distance from Bluff Lake, and they drove to Bluff Lake, parked the car on the top of the hill and walked down the hill to the cottage; that Robinson came back to the car and said the owner was not at home; that she asked him if there was any place they could get a drink of water and he replied there was a pump at the edge of the lake and they both had a drink of water there; that they then went to Grass Lake, left there about 7:30 and stopped on the way back for something to eat and then returned to the cottage, she says, at about eight o'clock, when it was still daylight. They parked the car and Robinson again went to Loff's cottage to return the key. He returned and said there was nobody at home. She says she got out of the car to get a drink of water; that Robinson went into the cottage to get a pail and some glasses; that she stood on the porch and he put the pail of water on the porch

table and drank; that after five minutes they went into the living room; that she sat on the chair and Robinson on the settee; that in about five minutes she heard someone say, ''Police, let us in''; that the next thing she saw was Robinson with his hands up and surrounded by Grady and a band of men he had brought with him. Robinson corroborates her testimony in this respect.

One of the most significant things in the record with reference to this incident is that it appears that Grady and Shanley knew on the day prior to this time that Mrs. Grady and Robinson were to be at the cottage the next evening. Those present at the time of the raid on the cottage were Grady, Shanley, Byron Cheney, W. H. Kennedy, James Burke and Tony Russell. All except Russell lived in Chicago. Cheney was telephoned to by Grady with reference to going out to this cottage on the day before (July 30) about two o'clock in the afternoon. According to his testimony he met Grady at Grady's room in the Sovereign hotel, Chicago, and on that day he, Grady and Shanley went to Bluff Lake where this cottage and the general situation were pointed out to him. They returned that day to Chicago. Cheney then made arrangements to meet Grady and Shanley at the cottage on the following evening, and he returned to Bluff Lake the next day, as he says, about 5:15 p. m., for the purpose of watching the movements of Robinson and Mrs. Grady.

At about four o'clock in the afternoon of July 31, Shanley called up James Val Burke, a cousin of Grady, for whom he worked, and Burke says that about ten minutes to five Shanley, Grady and Kennedy came for him in an automobile and they drove together to Wauconda, where they met a Mr. Flanagan, who was requested by Grady to go with them but who declined, and that Tony Russell, who worked on Flanagan's farm, was substituted.

Kennedy says that he was called up by Grady on either the 29th or 30th and was given to understand that he was to be ready for a call on the 31st; that Grady did not tell him what he wanted him for and he did not ask but kept the appointment and went with him on the afternoon of the 31st.

These parties all testify that they were unarmed; that Grady led them when they broke into the cottage, and they give testimony, denied by Mrs. Grady and Robinson, to the effect that she and Robinson were only partly clothed at the time of the entrance and evidence tending to show that they committed adultery at that time, which is also denied. The evidence shows that for an hour and a half these raiders compelled Mrs. Grady and Robinson to sit together on the settee; that in the meantime Shanley and Cheney went to Antioch and returned with a police officer; that Mrs. Grady and Robinson got in Robinson's car and with Grady and the officer sitting in the back seat drove to Antioch, where after some delay Shanley and Grady found a justice of the peace, whom they call "a judge" and who held a trial about midnight, at the conclusion of which he found Mrs. Grady and Robinson guilty of disorderly conduct and fined them $50 each. As a matter of fact, it appears that Mrs. Grady and Robinson were taken to Antioch without a warrant; that (although the evidence is contradictory on that point) Robinson made little, if any, resistance nor did he make any serious attempt to protect her, while she in the presence of this so-called judge passionately protested her innocence, which she asserted she would be able to prove beyond a doubt if she was allowed to produce medical testimony. At the time of the raid on the cottage Robinson's coat and her hat were in the automobile, and although it was dark Grady was able to extract the three letters of Mrs. Grady to Robinson from the pocket of the coat.

The testimony in the record with reference to Robinson, as already stated, is much more meager than we would wish. A full explanation of how it came about that this repairman for the telephone company was riding about in an automobile, renting a cottage at a summer resort, neglecting his obligations to his wife and children, one of whom was ill, would prove exceedingly helpful. If we assume (which seems possible) that he introduced Mrs. Grady as his wife at the time he rented the cottage, that he walked away with his arm about her (which would have been sufficient evidence to most people that they were not in fact married), that he kissed her publicly in the park—one of two alternatives would seem to be true; either Robinson's intention was to compromise Mrs. Grady and furnish evidence against her (which the easy manner in which her letters to him were obtained would indicate) or he was dull of understanding beyond all human comprehension. However this may be, the letters which Mrs. Grady wrote to him are not denied. Without them the evidence in this record would not be sufficient to convict her. Their contents cannot be explained away. They indicate that Robinson was making love to her and that whatever her attitude theretofore may have been, she was then ready to surrender. Such is the view of a majority of this court. The writer thinks the finding of the chancellor, who saw and heard the witnesses, should stand.

Assuming, then, that Mrs. Grady was guilty of adultery and Mr. Grady of extreme and repeated cruelty, desertion, attempting her life, and the fabrication of evidence against her, it remains to determine the rules of law applicable to this state of facts. It is urged by the husband that it is the law in Illinois that no other offense against the marital relation is recriminatory to a charge of adultery; that such is the rule without exception; that this court should follow it and according to the precedents of *Stiles v. Stiles*, 167

Ill. 576; *Lindsay v. Lindsay*, 226 Ill. 309; and *Mitchell v. Mitchell*, 241 Ill. App. 7, should reverse the decree and remand the cause with directions to grant the husband an absolute divorce as prayed. The Supreme and Appellate Courts of Illinois have often said in particular cases cited and relied on, that neither desertion nor extreme and repeated cruelty are recriminatory to a charge of adultery, and these cases have been construed by some legal writers as approving the doctrine for which complainant contends (see note to *Young v. Young*, 94 N. J. Eq. 155, 119 Atl. 92, 25 A. L. R. 1049, and note to *Ellett v. Ellett*, 157 N. C. 116, 72 S. E. 861, 39 L. R. A. [N. S.] 1135) but a careful examination of the cases will disclose that it has never been held to be the rule without exception nor declared to be the rule applicable in any case where the facts are such as appear in this record.

The law applicable to the granting of divorces in this State will be found in Cahill's St. ch. 40; chapter 40, Smith-Hurd's Ill. Rev. Stats. 1929, as amended.

In England, whence our system of jurisprudence is derived, divorces from the bond of matrimony were formerly granted only by act of parliament. The ecclesiastical courts granted divorces *a mensa et thoro* only for cruelty and adultery, and it was the law as announced by those courts that proof of adultery of one spouse would bar a suit by the other upon the same ground. Cruelty, however, furnished no bar to a suit for adultery. (*Proctor v. Proctor*, 2 Hagg. 292; *Dillon v. Dillon*, 3 Curt. 86.) The reason for the rule was that under that system the offenses were not of the same kind. The parties were not in *eodem delicto*. The soundness of the distinction was doubted, however, in *Dillon v. Dillon, supra*. While this was the practice of the ecclesiastical courts it was the established doctrine in parliament that in determining the rights of the parties under a petition for divorce *a vinculo matrimonii*, both adultery and cruelty might be

pleaded in recrimination as an absolute bar. In the matter of *Simmons' Divorce Bill*, 12 C. and F. 339, Simmons accused his wife of adultery and introduced evidence which proved a clear case of prostitution against her. She undertook to prove he had been living in adultery with another woman, but this evidence was held insufficient. Lord Brougham said that complainant might or might not be guilty as charged by the wife, but nevertheless his bill should be rejected because he for more than 16 years had separated himself from his wife without looking after her and without making any provision for her maintenance; that wholly independent of the charge against her husband and as if there was no ground whatsoever for it "on the evidence that this person neglected his wife, and threw her on the world without caring what became of her, or how she was supported, or allowing her anything towards her support," his bill should be rejected. Lord Campbell concurred in these views.

In Bishop on Marriage, Divorce and Separation, vol. 2, chap. 11, secs. 337–406, pp. 164–192, that author (after stating the rule which obtained in the ecclesiastical courts and the later English law as set forth in the Divorce Act of 1858, 36 and 37 Victoria, chap. 66, amended by 38 and 39 Victoria, see 77 and subsequent statutes) asserts the proposition that whether the divorce was from bed and board or from the bonds of matrimony, a judicial tribunal cannot distinguish between offenses to which the law attaches the same consequences, and that whether the divorce sought is from bed and board or from the bonds of matrimony, no form of the plaintiff's dereliction will afford a complete bar in recrimination unless it is such as the law has made ground for divorce of the one or the other sort, and that in a dissolution suit for whatever cause, any conduct for which the law provides the same consequence will be adequate in bar, whether otherwise of the same sort or not. He says (section 396, p. 188):

" . . . if the law is not so, we have this perplexing state of things, that cross-suits may be brought, resulting in both parties being entitled to prevail; then, if dissolution decrees are rendered in favor of both, each is the guilty and each the innocent party under statutory and unwritten laws which leave to the innocent and to the guilty, after the divorce, different rights, duties and pecuniary interests. The law, in most of our States, has no provision for the decree in favor of one of the parties to give way to that in favor of the other. There is a deadlock. And when this occurs, the movements of the court in the cause cannot do otherwise than stop. The cause cannot proceed to a decree. And this result shows, as distinctly as though the legislature had used the exact words, that the bar must be good; since, if it is not, the statutory and common-law provisions concerning collateral things can have no effect."

This doctrine seems to have been approved by distinguished judges, as in *Conant v. Conant,* 10 Cal. 249, opinion by Mr. Justice Field, and in *Handy v. Handy,* 124 Mass. 394, opinion by Chief Justice Gray.

The case of *Bast v. Bast,* 82 Ill. 584, is the one most relied on by complainant. The facts are meagerly reported, but it appears therefrom that the husband sued for divorce on the ground of adultery and obtained a decree apparently based upon the verdict of a jury. Upon appeal to the Supreme Court it was urged that the decree was against the evidence and further that the husband had deserted the wife under circumstances giving her the right to claim a divorce from him. Whether his desertion was before or after the adultery of which she was found guilty, does not appear. Without discussion and without the citation of any authority, the court said: "We do not think his desertion can exonerate the wife from the more serious charge of adultery. Neither that, nor drunkenness, nor cruelty, will, under our statute, constitute a sufficient recrim-

inatory defense, to a charge of adultery. Had appellee been guilty of a like offense, he could not claim a divorce.''

In *Stiles v. Stiles,* 167 Ill. 576, the husband filed his bill charging adultery, and the wife filed a cross-bill charging adultery and extreme and repeated cruelty. No evidence of the husband's adultery was produced, and the court stated in its opinion that all evidence tending to show extreme and repeated cruelty was a result of the failure on the part of the wife to observe the proprieties; that the evidence fell short of establishing extreme and repeated cruelty, and added: ''Besides, the law is well settled in this State that extreme and repeated cruelty is not sufficient as a recriminatory defense to the charge of adultery. *Bast v. Bast,* 82 Ill. 584.''

In *Decker v. Decker,* 193 Ill. 285, the wife filed a bill for divorce charging impotency and incapacity to perform the sexual act and also extreme and repeated cruelty. The cause was tried by a jury and there was a verdict for defendant. A retrial was granted by the court, and the husband then filed an amended answer in which he alleged that the wife had deserted him and had given birth to a child by another man since the prior trial. The wife excepted to the answer on the ground that the husband could not avail himself of the charge of adultery in recriminatory defense to the charge of extreme and repeated cruelty. The exceptions were overruled. She elected to abide by her pleadings and her bill was dismissed. She appealed upon the theory that by reason of section 10 of the Divorce Act, Cahill's St. ch. 40, ¶ 11, *adultery* might not be pleaded in recrimination to *a charge of cruelty,* and the Supreme Court held that such was not the effect of that statute and affirmed the decree. *Bast v. Bast* and *Stiles v. Stiles* are both cited, but evidently the question here involved was not an issue.

In *Zimmerman v. Zimmerman*, 242 Ill. 552, the wife filed her bill against the husband charging him with drunkenness and cruelty. He answered, denying the charges and filed a cross-bill charging her with adultery and praying for a divorce. She answered denying the charges and after hearing the chancellor entered a decree dismissing her bill and granting a divorce upon the cross-bill. She appealed. The court held in effect that the evidence was insufficient to sustain the charges against the husband and added: "The fact that a husband has been guilty of habitual drunkenness or extreme and repeated cruelty is not a sufficient recriminatory defense to a bill by him for divorce on the ground of adultery. *Bast v. Bast*, 82 Ill. 584; *Stiles v. Stiles*, 167 id. 576."

In *Hughes v. Hughes*, 133 Ill. App. 654, each party charged the other with adultery, the wife also charging the husband with cruelty. The cause was tried by a jury which exonerated both parties from the charge of adultery but found the husband guilty of cruelty. The Appellate Court examining the evidence concurred in the verdict as to the husband but found the wife guilty of adultery and directed that a divorce should be granted the husband on that ground. Independently of the question at issue the court said that the charge of extreme and repeated cruelty is not "a sufficient recriminatory defense to a charge of adultery."

*Whitlock v. Whitlock*, 187 Ill. App. 165, is cited. It is an abstracted decision, but it appears from the abstract that the husband sued for divorce on the ground of adultery, and the wife filed a cross-bill charging extreme and repeated cruelty; that the chancellor found the wife guilty of adultery, and that this court held upon review that the charge was sustained by the evidence.

In *Mitchell v. Mitchell*, 241 Ill. App. 7, the wife sued for divorce on the ground of extreme and repeated

cruelty and the husband filed a cross-bill charging adultery. The decree granted the divorce to the wife finding her not guilty of adultery and the husband guilty of cruelty. Upon review by the second division of this court, it was held that the evidence showed the wife to be guilty of adultery and that the husband was also guilty of extreme and repeated cruelty, but that this cruelty was not recriminatory to adultery. The court also held that the husband was entitled to a divorce and reversed and remanded the cause with directions in order that the property rights might be settled. The only authority cited by the court was *Zimmerman v. Zimmerman*, 242 Ill. 552.

It is true that the opinions in these cases state that neither desertion nor extreme and repeated cruelty are recriminatory to the charge of adultery, but they do not state that the rule is without exceptions, or that it would be followed under the facts which appear on such a record as this. Indeed, these cases are all distinguishable upon the facts in that the proof here shows affirmatively that the husband was entirely willing that the wife should commit adultery and persisted in a course of conduct well designed to bring it about. In other words, complainant is not in court with clean hands. There can be no doubt under all the circumstances that the husband's cruel and inhuman treatment and other wrongs against his wife had much to do with bringing about her indiscreet conduct. That he utterly failed to give her the protection to which she as a wife was entitled; that he committed brutal and unpardonable assaults upon her; that he has aggravated these actions by utterly unfounded and false charges; that he absolutely neglected her and, according to his own testimony, knew of her flirtations with Robinson without warning or protest, would make the granting of a divorce to him for her conduct an injustice of the gravest kind. We do not undertake to minimize the

solemnity of marriage vows, nor the necessity that a wife, as well as a husband, should keep them. Some of the opinions point out the grave character of the offense of adultery, in that such conduct on the part of the wife might introduce into the family a spurious heir. A husband who beats his wife then carrying his own child with such severity as to cause a miscarriage, has little reason in a court of equity to complain about the kind of heir which may be introduced into his family. The law of this State gives several reasons, each one of which it declares should be sufficient to sunder the marriage bond. A husband who breaks most of these and continues to break them through the years, cannot be said to come into court with clean hands. A court of equity is a court of conscience. Its arm is not shortened in such a case. A decree of divorce to this husband on these facts would offend the conscience and the sense of justice. In England at present under the construction of the statutes (20 and 21 Victoria, ch. 65, sec. 31) a question such as this case presents is determined by the judicial discretion of the chancellor. *Wickins v. Wickins,* Law Journal 1918, p. 169. Under the general rules and principles of equity, without a statute, we think a chancellor in the State of Illinois has the like power to settle the rights of parties before the court. We hold that the husband in this case is in court with hands so unclean as to preclude him from obtaining a divorce for the fault of the wife, and that the chancellor did not err in dismissing his bill.

Complainant also contends that the decree should be reversed because the allegations and the proofs do not agree, and he cites a large number of cases stating the general rule that a decree will be reversed under such circumstances. Such cases are *Field v. Field,* 319 Ill. 268, and *Giesler v. Giesler,* 336 Ill. 410. It is argued that the allegations in the cross-bill are not sufficient to justify that part of the decree which directed that

defendant should recover judgment for $2,400 with interest from July 1, 1923. The cross-bill alleged that Mrs. Grady turned over that sum of money in cash to her husband two days after their marriage and that no part of it had been returned to her, and prayed for general relief. The authorities are sufficient to the proposition that such a general prayer will support any decree warranted by the facts. (*Atchison T. & S. F. Ry. Co. v. Stamp,* 290 Ill. 428; *Kelly v. Kelly,* 293 Ill. 169.)

Complaint is also made of that part of the decree which refers to the question of the ownership of the building in which complainant is living to a master in order to determine the ownership thereof. It was said that the cause was not at issue on that part of it and that as a matter of fact Maguire and Grady were not ruled to answer. An interlocutory injunction had been issued against Grady and Maguire at a hearing of which they had notice and upon which they appeared. At any rate the decree is in this respect merely interlocutory.

It is also urged that when the bill and cross-bill were dismissed there was no pleading that would warrant relief, and that the court was without jurisdiction in these other matters. *Nathan C. Dow Co. v. Deist,* 123 Ill. App. 364, and *Tarr v. Stearman,* 264 Ill. 110, are cited as applicable. The decree, however, reserves jurisdiction for these purposes. The settlement of these matters was germane to the subject matter of the litigation between the parties, and it is elementary that when a court of equity has once acquired jurisdiction it will settle all controversies germane to the subject matter of the litigation. (*Elzas v. Elzas,* 183 Ill. 160; *Rybakowicz v. Rybakowicz,* 290 Ill. 550.)

Since a majority of the court are agreed that complainant is not entitled to the relief prayed for in his amended and supplemental bill, and since a majority

of the court are also of the opinion that defendant and cross complainant may not obtain the relief prayed for by her, it follows that the decree of the court which dismissed both bills will be affirmed.

O'Connor, P. J., concurs specially.
McSurely, J., dissents.

Mr. Presiding Justice O'Connor specially concurring: I agree with the conclusion reached but not with all that is said in the opinion. In my opinion the evidence shows that Mrs. Grady was guilty of adultery with Robinson. And although it has been held in this State that cruelty, under our statutes, does not constitute a sufficient recriminatory defense to a charge of adultery in the cases of *Bast v. Bast,* 82 Ill. 584, and *Stiles v. Stiles,* 167 Ill. 576, and other cases cited in the opinion, yet in none of these cases was the question decided or considered whether the cruelty of one spouse which long antedated the adultery of the other spouse, would bar a divorce from the spouse who committed adultery. A case similar in principle to the case before us is *Rapp v. Rapp,* 67 N. J. Eq. 236, 58 Atl. 167. In that case the complainant's petition for a divorce showed desertion of his wife for a period fixed by the statute as ground for an absolute divorce, and it was held that such desertion would bar a divorce against the wife for her subsequent adultery. The court there said (p. 168): "That a desertion which has existed during the period fixed by the statute as ground for an absolute divorce should be a bar against the deserter asking for a divorce against the deserted party for a subsequent adulterous act seems manifest. A man who leaves his wife without his protection, subjected to the temptations which assail a deserted wife, has little cause for complaint if she unfortunately yields to the solicitations which her situation invites.

The meagerness of the claim which such a man has upon the divorcing branch of the government is depicted by Lord Brougham in the matter of *Simmons' Divorce Bill,* 12 C. & F. 339.''

We think the quotation from the New Jersey court is sound and comports with our sense of justice and is applicable to the facts in the instant case. The evidence before us clearly shows an extreme case as found by the learned chancellor—that Grady was guilty of extreme cruelty towards his wife, driving her out of his home at the point of a pistol; and if about six years afterwards she yielded to the solicitations which her situation invited, he cannot now take advantage of his own wrongdoing and claim a divorce on the ground that his wife was at fault.

The rule we have above stated is sustained by the highest authority. In His Sermon on the Mount Christ said, ''But I say unto you, That whosoever shall put away his wife, saving for the cause of fornication, causeth her to commit adultery.'' Matthew, chapter 5, verse 32.

And the defendant and cross complainant having been guilty of adultery is not entitled to a divorce. 14 Cyc. 650; 2 Bishop on Marriage, Divorce and Separation, sec. 350; Nelson on Divorce and Separation, sec. 429.

Mr. Justice McSurely dissenting: I concur in the holding that the adultery of defendant was proven, and in my opinion complainant should have been granted a divorce.

With due respect to the opinions of authorities in other jurisdictions, I am not convinced that we should depart from the rule frequently stated by the Supreme Court of this State, namely, that cruelty does not constitute a sufficient recriminatory defense to a charge of adultery. *Decker v. Decker,* 193 Ill. 285; *Stiles v.*

*Stiles,* 167 Ill. 576; *Bast v. Bast,* 82 Ill. 584; *Zimmerman v. Zimmerman,* 242 Ill. 552. This has been followed by the Appellate Court. *Mitchell v. Mitchell,* 241 Ill. App. 7; *Whitlock v. Whitlock,* 187 Ill. App. 165; *Hughes v. Hughes,* 133 Ill. App. 654.

Aside from our duty to follow our own court, this rule should be observed as founded in reason. To determine whether the wife, guilty of adultery, may successfully defend by showing that the husband treated her with extreme cruelty would raise the confusing and illogical question as to what degree of cruelty would excuse the act of adultery.

So with desertion. By what criterion can the period of desertion be determined which would justify adultery by the deserted one?

It seems to me that both views expressed in the majority opinions rest upon the fallacious and dangerous assumption that the wronged wife has the right to commit a graver wrong, or at least cannot be held to an account.

I call attention to the inconsistency of the decree entered by the chancellor, which found complainant guilty of extreme and repeated cruelty, as charged in defendant's cross-bill, and yet, her cross-bill was dismissed for want of equity. I respectfully suggest that this inconsistency is repeated and emphasized in the majority opinions by affirming the dismissal of defendant's cross-bill which charged cruelty, and at the same time denying a divorce to complainant because of his cruelty.